799 F.2d 447
 William R. CODY, individually and on behalf of all other
persons similarly situated, Appellees,
v.
Carole HILLARD, President of the Board of Charities and
Corrections; Frank Brost, Vice President; Ted Spaulding,
Member; D.A. Gehlhoff, Member; Lyle Swenson, Member;
James Smith, Executive Secretary; Herman Solem, Warden of
the South Dakota State Penitentiary; sued individually and
in their official capacities, Appellants.
William R. CODY, Individually and on behalf of all other
persons similarly situated, LaVerne Koenig,
member, Protective Custody Plaintiffs, Appellant,
v.
Carole HILLARD, President of the Board of Charities and
Corrections; Frank Brost, Vice President; Ted Spaulding;
D.A. Gehloff, Member; Lyle Swenson, Member; James Smith,
Executive Secretary; Herman Solem, Warden of the South
Dakota State Penitentiary; sued individually and in their
official capacities, Appellees.
 Nos. 85-5270, 85-5302.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 13, 1986.
Decided Sept. 2, 1986.
Rehearing Granted Oct. 28, 1986.*
 
 Richard Dale, Asst. Atty. Gen., Pierre, S.D., for appellant.
 Elizabeth Alexander, Washington, D.C., for appellees.
 Before HEANEY and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 This is an appeal from an order of the district court requiring officials at the South Dakota State Penitentiary (SDSP) to cease double celling inmates at SDSP, both in the general population and in protective custody. On appeal, the officials contend that the trial court erred in finding that double-celling inmates at SDSP violates the Eighth and Fourteenth Amendments to the United States Constitution. They also claim the court erred in using the "rated capacities" of the American Corrections Association as a referrent for measuring constitutional violations. Protective custody inmates cross-appeal claiming that they are treated differently from inmates in the general population in violation of equal protection guarantees. We affirm.
 
 BACKGROUND
 
 2
 William R. Cody filed this class action suit under 42 U.S.C. Sec. 1983 on behalf of all persons who are now or will be incarcerated in the South Dakota State Penitentiary at Sioux Falls, South Dakota or in the Women's Correctional Facility at Yankton, South Dakota. Cody complained of overcrowding and living conditions hazardous to the health of the inmates. He protested, among other things, poor medical care, inadequate recreation, contaminated food, and noncompliance with fire safety standards. After an eleven day trial, the district court found that many of these conditions violated the eighth and fourteenth amendments to the United States Constitution. The trial court ordered the prison officials to prepare plans to cure the constitutional violations, which prison officials submitted by the summer of 1985. After extensive negotiation, the parties entered into a consent decree covering certain improvements to be made at the SDSP.
 
 
 3
 Following a hearing on July 8, 1985, the trial court entered the partial consent decree, and a second judgment on the remaining contested issues, which is the subject of this appeal. It ordered: 1) That except in the case of certain emergencies, the daily population of the SDSP be reduced in compliance with a schedule aimed at reducing the population to 95% of that specified by the American Corrections Association (ACA) as the capacity of SDSP; 2) that SDSP will stop double-celling inmates in protective custody; and 3) further improvements in health services. The state appeals orders one and two which concern double-celling.
 
 
 4
 On appeal, the officials claim that they have already ended the practice of double-celling general population inmates and have greatly reduced the double-celling of protective custody inmates, but they do not believe this is required by the Constitution, and they want to retain the flexibility to double-cell, if necessary, in the future. They also claim that the district court erred in requiring them to comply with American Correctional Association guidelines for setting prison population maximums.
 
 DISCUSSION
 
 5
 The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. In Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court considered for the first time the limitation that the eighth amendment imposes upon the conditions in which a state may confine those convicted of crimes. The Court stated that conditions of confinement "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399.
 
 
 6
 The Rhodes Court specifically considered whether double-celling at an Ohio prison constituted cruel and unusual punishment. The Court held that in light of the otherwise exceptionally good conditions of confinement at the institution,[1] double-celling was not unconstitutional because it "did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement." Rhodes, 452 U.S. at 348, 101 S.Ct. at 2400. Thus, in determining whether prison conditions such as double-celling violate the eighth amendment, courts must consider all of the circumstances surrounding the conditions of confinement.
 
 
 7
 Applying this test, we affirm the district court's holding that SDSP's practice of double-celling, in light of the numerous deficient conditions of confinement at the prison, constitutes a violation of the eighth amendment under Rhodes. We point out that the prison officials did not appeal from the district court's detailed findings of deficient conditions at SDSP. Accordingly, in assessing SDSP's appeal of the double-celling orders, we accept as true the district court's findings as to the conditions at SDSP.
 
 
 8
 At the time of trial, the SDSP housed 538 general population inmates in 440 single occupancy cells. One hundred and ninety-six inmates were doubled up. The cells ranged in size from fifty-five square feet to sixty-three square feet. Some of the cells lacked adequate ventilation, and other cells lacked running hot water. The electrical wiring in the cells is substandard.
 
 
 9
 The court found that fire safety measures are inadequate: exit doors insufficient, night staff insufficient to respond in an emergency, ventilation inadequate, no fire alarm system, sprinkling system, or automatic unlocking device for the cells doors, and that there were plastic pipes throughout the prison with the potential to emit toxic vapors during a fire. The court further found that kitchen conditions are unsanitary and unsafe, including an inadequate milk pastuerization procedure, improper storage of canned goods and uncleanable dishes and pots. Additionally, medical and dental care available to prisoners is grossly inadequate. The medical and dental units are understaffed, and SDSP resorts to the use of untrained inmates to examine and x-ray patients.
 
 
 10
 The district court also made findings as to the impact of double-celling on the inmates, which SDSP officials again have not appealed from. The court found that:
 
 
 11
 Double-celling at the SDSP has resulted in crisis management with respect to the maintenance of ancillary support facilities such as food services, laundry services, medical services, plumbing and electrical wiring.
 
 
 12
 Double-celling at the SDSP has resulted in an overloading of services such as the work, recreation and school programs.
 
 
 13
 Since the advent of double-celling in the first part of 1981, there has been one recorded instance of a riot involving approximately twenty persons in November, 1981, and approximately sixty incidents * * * of fighting or assaults between inmates and/or inmates and staff.
 
 
 14
 The SDSP is grossly under-staffed. The level of prison staff has not increased in proportion to the level of the general inmate population.
 
 
 15
 Cody v. Hillard, 599 F.Supp. 1025, 1033 (D.S.D.1984).
 
 
 16
 Moreover, the court found that double-celling creates a serious potential for the spread of communicable diseases due to cramped living spaces and an increased potential for inmates to contact upper respiratory diseases.
 
 
 17
 We now turn to the district court's findings with respect to protective custody inmates. Out of forty-five inmates housed in protective custody at the SDSP, twenty-two were double-celled. The district court found that "[t]he negative impact attributed to double-celling in other areas of the institution is exacerbated in the protective custody area due to the inordinately limited out-of-cell time available to these inmates." Cody, 599 F.Supp. at 1034.
 
 
 18
 In light of the uncontested findings of fact that we have summarized, we conclude that the district court did not err in banning double-celling both in the general population and in protective custody cells. The facts found serve as an adequate basis to constitutionally require more space for inmates, not only to improve the health and safety conditions for the inmates, but to enhance security and to reduce violence. Our finding is supported by numerous decisions holding double-celling unconstitutional where there are other serious deficiencies in the conditions of confinement. See e.g., French v. Owens, 777 F.2d 1250, 1252 (7th Cir.1985), (Seventh Circuit upheld a ban on double-celling "in light of the poor supervision, safety, medical care and food preparation at the facility[.]"); Toussaint v. Yockey, 722 F.2d 1490, 1492 (9th Cir.1984) (injunction upheld against double-celling where it "engenders violence, tension and psychological problems"); Wellman v. Faulkner, 715 F.2d 269 (7th Cir.1983), cert. denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984) (overcrowding can violate eighth amendment).
 
 
 19
 The SDSP, like the institutions at issue in French, Toussaint, and Wellman, is very different from the prison under scrutiny in Rhodes. It is anything but "a top flight institution," and the horrible conditions are greatly exacerbated by double-celling of inmates.
 
 
 20
 In so holding, we do not intimate that the order banning double-celling cannot be modified in the future. Prison officials apparently have submitted progress reports--which are not part of the record on this appeal--alleging that improvements have been made at the SDSP. Prison officials should apply to the district court for an evidentiary hearing to determine the extent of the improvements. Upon a proper showing, the district court may determine that the ban on double-celling is no longer justified.
 
 
 21
 Finally, the state attacks the district court's use of the ACA standards for prison capacity as the guidelines for constitutional requirements. It is true that Rhodes v. Chapman, suggested that district courts refrain from overreliance on expert opinions on prison capacity. However, the Court did not prohibit such consideration and several post-Rhodes decisions have approved the use of such guidelines as the ACA guidelines where the conclusions therein are supported by other independent evidence. See e.g., Touissaint, 722 F.2d 1490 (9th Cir.1984). The district court's use of these guidelines is appropriate in light of its detailed factual findings, based on a wide-range of evidence.
 
 
 22
 The final issue on appeal is the cross-appeal by the protective custody inmates. They claim that the ban on double-celling is not enough and that they are entitled to additional relief such as more exercise time. Their argument essentially is that conditions in the protective custody unit are not as good as conditions in the general population units and that this violates their rights to equal protection. We have previously stated that "[t]o succeed on an equal protection claim the [protective custody inmates are] required to show that they received treatment which was invidiously dissimilar to that received by other inmates." Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir.1984). We conclude that the cross-appellants have made no such showing.
 
 
 23
 BOWMAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 24
 I concur only in the Court's holding concerning the cross-appeal by the protective custody inmates. The remainder of the Court's decision, in my view, both "wrench[es] the Eighth Amendment from its language and history," Rhodes v. Chapman, 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), and engages in analysis directly foreclosed by Supreme Court precedent. I respectfully dissent.
 
 
 25
 Initially, I believe a more complete exposition of Eighth Amendment standards is necessary than the Court's opinion provides. In Rhodes, the Supreme Court stated that "when the conditions of confinement compose the punishment at issue," those conditions "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Id. at 347, 101 S.Ct. at 2399. The Court referred to conditions that are "totally without penological justification," Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976), as the kind of conditions that violate the Eighth Amendment. 452 U.S. at 346, 101 S.Ct. at 2399. Recently, the Court elaborated further on this standard in Whitley v. Albers, --- U.S. ---, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Justice O'Connor, writing for the Court, observed that "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id. at 1084.
 
 
 26
 The Eighth Amendment leaves very broad latitude to the states in the administration of their prisons. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399. Moreover, the federal courts traditionally
 
 
 27
 have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.
 
 
 28
 Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). All of these observations aptly fit this case.
 
 
 29
 Even granting that the District Court's factual findings are correct, I do not agree that double-celling at SDSP evidences the "obduracy and wantonness" necessary to constitute a violation of the Eighth Amendment. Double-celling at SDSP is not "totally without penological justification." Rhodes, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting Gregg, 428 U.S. at 183, 96 S.Ct. at 2929). While double-celling may not be desirable, it allows the continued detention of persons convicted of serious crimes when they might otherwise have to be released at the peril of law-abiding members of our society. As the Court's opinion notes, double-celling would be cruel and unusual punishment under Rhodes only if the double-celling "[led] to deprivations of essential food, medical care, or sanitation" or if it "increase[d] violence among inmates or create[d] other conditions intolerable for prison confinement." 452 U.S. at 348, 101 S.Ct. at 2400. In my judgment, the record in this case falls far short of supporting the Court's conclusion that the line drawn by Rhodes has been crossed by double-celling at SDSP. Accordingly, I believe there is no constitutional basis for the remedial order that the Court today affirms.
 
 
 30
 The District Court's final order provides that
 
 
 31
 in the event that the daily population of the SDSP, other than Protective Custody inmates, shall exceed 95% of total American Corrections Association (ACA) rated capacities for 60 consecutive days, the defendants shall commence to develop programs to reduce that population; if such population shall exceed 110% of such ACA capacities for 60 consecutive days, the State within 180 days shall reduce said population to 95% of the total ACA capacities of these facilities; provided, however, that days during which populations may exceed these percentages as a consequence of riot, fire, acts of God, labor unrest, war, civil disturbance, or any other emergencies shall be excluded in applying the foregoing.
 
 
 32
 Cody v. Hillard, Civ. No. 80-4039, at 1-2 (D.S.D. July 8, 1985) (Final Order). This order could not conceivably be proper unless the ACA standards relied upon by the District Court represented the constitutional norm. But the Supreme Court explicitly has rejected this approach. In Bell v. Wolfish, the Court stated that "while the recommendations of these various groups [such as ACA] may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." 441 U.S. 520, 543-44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). In Rhodes, the Court quoted the foregoing statement from Wolfish and further observed in regard to Eighth Amendment claims that
 
 
 33
 generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as "the public attitude toward a given sanction." We could agree that double celling is not desirable, especially in view of the size of these cells. But there is no evidence in this case that double celling is viewed generally as violating decency.
 
 
 34
 452 U.S. at 348-49 n. 13, 101 S.Ct. at 2400 n. 13. Contrary to this clear instruction from the Supreme Court, the order of the District Court effectively transforms the ACA standards into Constitutional requisites under the Eighth Amendment, and it does so without a shred of evidence for the counter-intuitive proposition that double-celling is viewed generally as violating decency. Thus, it is apparent that neither the District Court nor our Court has properly applied the Constitutional standards to the facts of this case.
 
 
 35
 The District Court found that "[d]ouble-celling over time has a negative impact on all programs and services" and "has resulted in crisis management with respect to the maintenance of ancillary support facilities such as food services, laundry services, medical services, plumbing and electrical wiring." Cody v. Hillard, 599 F.Supp. 1025, 1033 (D.S.D. 1984). The District Court detailed such problems in these areas as unsanitary practices in storing and preparing food, the use of untrained inmates to provide medical services to other inmates, inadequate ventilation and plumbing, and substandard electrical wiring and other fire hazards. Whatever the merit of these findings, there has been no showing, and the District Court has made no finding, that the elimination of double-celling will alleviate these problems to any perceptible degree. An appropriate remedy would relate to correction of the constitutionally deficient conditions that have been found to exist, if any there be, rather than to the elimination of double-celling.
 
 
 36
 The Court's opinion quotes with approval the District Court's finding that double-celling "has resulted in an overloading of services such as the work, recreation and school programs," id., but never tells us why this matters for purposes of Eighth Amendment scrutiny. In fact, the Supreme Court dismissed precisely this sort of contention as a basis for finding cruel and unusual punishment in Rhodes, stating that "limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." 452 U.S. at 348, 101 S.Ct. at 2400.
 
 
 37
 The District Court found, as the Court's opinion notes, that "[s]ince the advent of double-celling in approximately the first part of 1981, there has been one recorded instance of a riot involving approximately twenty persons ... and approximately sixty incidents ... of fighting or assaults between inmates and/or inmates and staff." 599 F.Supp. at 1033. Prison violence is, of course, not a recent development and occurs with similar frequency in institutions that do not double-cell. There is nothing in the record to show the comparable number of incidents of violence at SDSP before and after double-celling. Accordingly, there is no evidentiary basis for a conclusion that double-celling has caused an increase in such incidents, and we note that the District Court did not make a finding on this question of fact.
 
 
 38
 The Court's opinion also is notable for those portions of the District Court opinion that it does not mention. No mention is made of the District Court's finding that "[t]here is a relatively low level of tension between inmates and staff at the SDSP." Id. at 1033. Nor does the Court discuss the District Court's findings that the level of sanitation at SDSP is adequate or that the prison administrators and staff have made sincere efforts to maintain a healthful environment. Id. at 1052. Similarly, the Court does not acknowledge the District Court's finding that the prison
 
 
 39
 administration has attempted to reduce the negative impact of double-celling by expanding the amount of out-of-cell time afforded inmates, by making a reasonable effort to double-cell only those inmates who volunteer to live with another inmate in the same cell, and by increasing the placement of inmates: (1) into trustee status in a detached unit of SDSP ...; (2) into trustee status in a unit located at the Human Services Center in Yankton; (3) into a detached dormitory, outside the walls of the prison, known as the "West Farm"; (4) into public service restitution programs in various communities in South Dakota.... The SDSP has also attempted to place inmates in work release or school release programs throughout the state.
 
 
 40
 Id. at 1033. As the District Court recognized, the prison administration is striving within the limits of available resources to limit the amount of double-celling that must be done to accommodate the rising tide of convicted felons. This hardly reflects "obduracy and wantonness" on the part of those whose job it is to manage SDSP. See Whitley, 106 S.Ct. at 1084.
 
 
 41
 I fail to comprehend how the conditions described in this record can be said to inflict pain or amount to punishment and how prison administrators making "sincere efforts" can be said not to be acting in "good faith." Id. at 1084. The present case is light years removed from the type of torture, deprivation, and sadistic punishment with which the Cruel and Unusual Punishments Clause is concerned. See Hutto v. Finney, 437 U.S. 678, 681-84 & nn. 3-6, 98 S.Ct. 2565, 2568-70 & nn. 3-6, 57 L.Ed.2d 522 (1978) (conditions included use of a five-foot long leather strap to whip inmates for minor offenses, use of a device to administer "electrical shocks to various sensitive parts of an inmate's body," and use of inmate guards authorized to use deadly force against "escapees" and who therefore could "murder another inmate with practical impunity"). The lack of anything in this record even remotely approaching these conditions, or even remotely showing any conditions of confinement that fall below the Constitutional standards elucidated in cases such as Rhodes and Whitley, reveals the impropriety of the Court's action today.
 
 
 42
 Further, it seems to me that the incongruity of the order prohibiting double-celling of inmates who voluntarily have chosen to live together in the same cell should cause the Court to pause. The necessary implication from this feature of the order--that voluntary "double-bunking" constitutes "wanton and unnecessary infliction of pain" amounting to cruel and unusual punishment--is insupportable. What is worse, it trivializes the Constitution and mocks the purposes of the Eighth Amendment.
 
 
 43
 Finally, the District Court also enjoined the State from double-celling in the protective custody area of the prison. The court found that 22 out of 45 protective custody inmates were double-celled and concluded that this was "inappropriate and without correctional justification." 599 F.Supp. at 1034. The court further noted that "[t]hese inmates need protection not only from other inmates in the general population but also from other protective custody inmates" and concluded that the negative impact of double-celling was exacerbated for these inmates "due to the inordinately limited out-of-cell time available to these inmates." Id. I believe that the District Court here merely has substituted its "judgment for that of officials who have made a considered choice." Whitley, 106 S.Ct. at 1085. Whether an inmate in protective custody needs protection from someone with whom he is assigned to share a cell is a matter more appropriately left to the prison officials who are charged with making decisions of this nature. Courts should be mindful that our authority in such questions "spring[s] from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Wolfish, 441 U.S. at 539, 99 S.Ct. at 1874 (citations omitted). I have found nothing in the record or the District Court's findings of fact to persuade me that my views concerning double-celling generally should be different in regard to the protective custody area of the prison.
 
 
 44
 The record before us at most demonstrates that SDSP is not always comfortable. As the Supreme Court noted in Rhodes, however, "the Constitution does not mandate comfortable prisons, and prisons of [SDSP's] type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court." 452 U.S. at 349, 101 S.Ct. at 2400. Because I do not believe that double-celling in the circumstances presented by this record is violative of the Eighth Amendment, I would reverse the District Court's order with respect to double-celling.
 
 
 
 *
 See 8th Cir., 804 F.2d 440
 
 
 *
 The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 The physical plant, built in the early 1970s, was "unquestionably a top-flight, first-class facility." Rhodes, 452 U.S. at 341, 101 S.Ct. at 2396. The cells there averaged sixty-three square feet and contained a cabinet-type night stand, a shelf and radio built into the wall, a wall-mounted sink with hot and cold running water and a flush toilet. All cells had a heating and air circulation vent near the ceiling and more than half of them had a window that the inmates could open and close. All cells used to house two inmates were equipped with two-tiered bunk beds. Medical, food and other services were good