830 F.2d 912
 William R. CODY, individually and on behalf of all other
persons similarly situated, Appellees,
v.
Carole HILLARD, President of the Board of Charities and
Corrections; Frank Brost, Vice President; Ted Spaulding,
Member; D.A. Gehlhoff, Member; Lyle Swenson, Member;
James Smith, Executive Secretary, Herman Solem, Warden of
the South Dakota State Penitentiary; sued individually and
in their official capacities, Appellants.
William R. CODY, individually and on behalf of all other
persons similarly situated, LaVerne Koenig,
member, Protective Custody Plaintiffs, Appellant,
v.
Carole HILLARD, President of the Board of Charities and
Corrections; Frank Brost, Vice President; Ted Spaulding;
D.A. Gehlhoff, Member; Lyle Swenson, Member; James Smith
Executive Secretary; Herman Solem, Warden of the South
Dakota State Penitentiary; sued individually and in their
official capacities, Appellees.
 Nos. 85-5270, 85-5302.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 12, 1987.
Decided Oct. 6, 1987.
Rehearing Denied Nov. 24, 1987.
 
 Richard Dale, Asst. Atty. Gen., Pierre, S.D., for appellants.
 Elizabeth Alexander, Washington, D.C., for appellees.
 Before LAY, Chief Judge, HEANEY, ROSS, McMILLIAN, ARNOLD, J.R. GIBSON, FAGG, BOWMAN, WOLLMAN, and MAGILL, Circuit Judges, en banc.
 BOWMAN, Circuit Judge.
 
 
 1
 This is an appeal from an order of the District Court requiring officials at the South Dakota State Penitentiary (SDSP) to cease the double-celling of inmates at SDSP, both in the general population and in protective custody. On appeal, before a panel of this Court, the officials contended that the trial court erred in finding that double-celling of inmates at SDSP violates the Eighth and Fourteenth Amendments to the United States Constitution. They also claimed that the District Court erred in using the "rated capacities" of the American Corrections Association (ACA) as a reference for measuring the permissible capacity of the prison under the Eighth Amendment. Inmates in protective custody cross-appealed, claiming that under SDSP rules they were treated differently from inmates in the general population in violation of their rights under the equal protection clause. The panel, with one member dissenting, affirmed the District Court's order. Cody v. Hillard, 799 F.2d 447 (8th Cir.1986). The prison officials petitioned this Court for rehearing en banc, and we granted the petition. Cody v. Hillard, 804 F.2d 440 (8th Cir.1986). After further briefing and oral argument to the Court en banc, we now reverse the District Court's order with respect to double-celling.
 
 
 2
 The facts of the case are detailed in the panel opinion, 799 F.2d at 448-49, and in the extensive factual findings of the District Court, Cody v. Hillard, 599 F.Supp. 1025, 1026-46 (D.S.D.1984). We will not repeat them here.
 
 
 3
 As recognized by the District Court, the panel majority, and the panel dissent, the inmates' Eighth Amendment claims regarding the conditions of their confinement are governed by the Supreme Court's opinion in Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In Rhodes, the Supreme Court specifically considered whether double-celling at an Ohio prison constituted cruel and unusual punishment under the Eighth Amendment. The Court held, based on the undisputed factual findings of the district court, that the "conclusion that double celling at [the Ohio facility] constitutes cruel and unusual punishment is insupportable." Id. at 347, 101 S.Ct. at 2400.
 
 
 4
 The Court made clear in Rhodes that "when the conditions of confinement compose the punishment at issue," those conditions "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." Id. The Court referred to conditions that are " 'totally without penological justification,' " id. at 346, 101 S.Ct. at 2399 (quoting Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976)), as the kind of conditions that violate the Eighth Amendment. Recently, the Court elaborated further on this standard in Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Justice O'Connor, writing for the Court, observed that "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cell-block." Id. 106 S.Ct. at 1084.
 
 
 5
 As Rhodes and Whitley make clear, the Eighth Amendment leaves very broad latitude to the states in the administration of their prisons. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399. Moreover, the federal courts traditionally
 
 
 6
 have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.
 
 
 7
 Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnotes omitted). All of these observations aptly fit this case. See also Goff v. Nix, 803 F.2d 358, 371 (8th Cir.1986), petition for cert. filed, May 20, 1987.
 
 
 8
 Even granting that the District Court's factual findings are correct, double-celling at SDSP simply does not evince the "wanton and unnecessary infliction of pain" necessary to constitute a violation of the Eighth Amendment. Rhodes, 452 U.S. at 347, 101 S.Ct. at 2399. Double-celling could be viewed as cruel and unusual punishment only if it "[led] to deprivations of essential food, medical care, or sanitation" or if it "increase[d] violence among inmates or create[d] other conditions intolerable for prison confinement." 452 U.S. at 348, 101 S.Ct. at 2400. The record in this case falls far short of supporting the District Court's conclusion that the line drawn by Rhodes has been crossed by double-celling at SDSP. Accordingly, there is no constitutional basis for the District Court's remedial order with respect to double-celling.
 
 
 9
 In the District Court's final order its remedy is based on compliance with ACA rated capacities, which in turn were based on recommendations by the South Dakota penitentiary authorities. The Supreme Court has explicitedly rejected the proposition that such standards establish a constitutional norm. In Bell v. Wolfish, the Court stated that "while the recommendations of these various groups [such as ACA] may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." 441 U.S. 520, 543-44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). In Rhodes, the court quoted the foregoing statement from Wolfish and further observed in regard to Eighth Amendment claims that
 
 
 10
 generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as "the public attitude toward a given sanction."
 
 
 11
 We need not consider the propriety of the District Court's final order mandating relief and its reference to ACA rated capacities in view of our conclusion that on the record before us double-celling at SDSP does not violate the Eighth Amendment.
 
 
 12
 The District Court found that "[d]ouble-celling over time has a negative impact on all programs and services" and "has resulted in crisis management with respect to the maintenance of ancillary support facilities such as food services, laundry services, medical services, plumbing and electrical wiring." Cody v. Hillard, 599 F.Supp. 1025, 1033 (D.S.D.1984). The District Court detailed such problems in these areas as unsanitary practices in storing and preparing food, the use of untrained inmates to provide medical services to other inmates, inadequate ventilation and plumbing, and substandard electrical wiring and other fire hazards. Whatever the merit of these findings, there has been no showing, and the District Court has made no finding, that the elimination of double-celling will alleviate these problems to any perceptible degree. An appropriate remedy would relate to correction of the constitutionally deficient conditions that have been found to exist, if any there be, rather than to the elimination of double-celling.
 
 
 13
 The District Court also found that double-celling at SDSP has resulted in an overloading of services such as the work, recreation, and school programs. 599 F.Supp. at 1033. Even accepting this finding, we cannot conclude that such overloading is significant for purposes of the Eighth Amendment. In fact, the Supreme Court dismissed precisely this sort of contention as a basis for finding cruel and unusual punishment in Rhodes, stating that "limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." 452 U.S. at 348, 101 S.Ct. at 2400.
 
 
 14
 The District Court further found that "[s]ince the advent of double-celling in approximately the first part of 1981, there has been one recorded instance of a riot involving approximately twenty persons ... and approximately sixty incidents ... of fighting or assaults between inmates and/or inmates and staff." 599 F.Supp. at 1033. Prison violence is, of course, not a recent development and occurs with similar frequency in institutions that do not double-cell. There is nothing in the record to show the comparable number of incidents of violence at SDSP before and after double-celling. Accordingly, there is no evidentiary basis for a conclusion that double-celling has caused an increase in such incidents, and we note that the District Court did not make a finding on this question of fact.
 
 
 15
 Significantly, many of the District Court's factual findings suggest that the conditions at SDSP, regardless of the impact of double-celling, fall well within constitutional standards. The District Court found that "[t]here is a relatively low level of tension between inmates and staff at the SDSP," 599 F.Supp. at 1033, that the level of sanitation at SDSP is adequate, id. at 1052, and that the prison administrators and staff have made sincere efforts to maintain a healthful environment. Id. Similarly, the District Court found that the prison administration has taken various steps "to reduce the negative impact of double-celling." Id. at 1033. As the District Court recognized, the prison administration is striving within the limits of available resources to restrict the amount of double-celling that must be done to accommodate the rising tide of convicted felons. This hardly reflects "obduracy and wantonness" on the part of those whose job it is to manage SDSP.[1] See Whitley, 106 S.Ct. at 1084.
 
 
 16
 The conditions described in this record cannot be said to inflict pain or amount to punishment, nor can prison administrators making "sincere efforts" be said not to be acting in "good faith." Id. at 1084. The present case is light years removed from the torture, cruel deprivation, and sadistic punishment with which the Cruel and Unusual Punishments Clause is concerned. See Hutto v. Finney, 437 U.S. 678, 681-84 & nn. 3-6, 98 S.Ct. 2565, 2568-70 & nn. 3-6, 57 L.Ed.2d 522 (1978) (conditions included use of a five-foot long leather strap to whip inmates for minor offenses, use of a device to administer "electrical shocks to various sensitive parts of an inmate's body," and use of inmate guards authorized to use deadly force against "escapees" and who therefore could "murder another inmate with practical impunity"). The lack of anything in this record even remotely approaching these conditions, or even remotely showing any conditions of confinement that fall below the constitutional standards elucidated in cases such as Rhodes and Whitley, reveals the impropriety of the District Court's order.
 
 
 17
 The District Court enjoined the State from double-celling in the protective custody area of the prison. The court found that the double-celling of protective custody inmates was "inappropriate and without correctional justification," and that "[t]hese inmates need protection not only from other inmates in the general population but also from other protective custody inmates." 599 F.Supp. at 1034. The District Court here merely substituted its "judgment for that of officials who have made a considered choice." Whitley, 106 S.Ct. at 1085. Whether an inmate in protective custody needs protection from someone with whom he is assigned to share a cell is a matter more appropriately left to the prison officials who are charged with making decisions of this nature. Courts should be mindful that our authority in such questions "spring[s] from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Wolfish, 441 U.S. at 539, 99 S.Ct. at 1874 (citations omitted). We have found nothing in the record or the District Court's findings of fact to persuade us that our conclusions regarding double-celling generally should be different with regard to the protective custody area of the prison.
 
 
 18
 The record before us at most demonstrates that SDSP is not always comfortable. As the Supreme Court noted in Rhodes, however, "the Constitution does not mandate comfortable prisons, and prisons of [SDSP's] type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court." 452 U.S. at 349, 101 S.Ct. at 2400. Double-celling in the circumstances presented by this record does not violate the Eighth Amendment. We therefore reverse the District Court's order with respect to double-celling.
 
 
 19
 The panel opinion also addressed the cross-appeal of the protective custody inmates, who claimed that conditions in the protective custody unit were inferior to conditions in the general population units, and that the order ending double-celling was not sufficient, for purposes of their constitutional right to equal protection, to bring the conditions in which they were kept in line with those of the general inmate population. 799 F.2d at 451. The panel unanimously held that the protective custody inmates had not shown " 'that they received treatment which was invidiously dissimilar to that received by other inmates,' " and thus that the protective custody inmates could not succeed on their equal protection claim. Id. (quoting Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir.1984) (per curiam)). A petition for rehearing en banc of the cross-appeal was rejected by this Court. Cody v. Hillard, Nos. 87-5270/5302 (8th Cir. Oct. 6, 1986). Accordingly, that portion of the panel opinion rejecting the claim of the cross-appellants is not before the Court en banc, and the panel's disposition of the claim will stand.
 
 
 20
 To summarize, we reverse the order of the District Court insofar as it finds that double-celling of inmates at SDSP violates the Eighth and Fourteenth Amendments. We leave undisturbed the panel affirmance of the District Court's order rejecting the protective custody inmates' challenge to the additional restrictions attendant to their protective custody. We remand the case to the District Court and direct it to vacate its order requiring SDSP to cease double-celling and to bring its inmate population within ACA guidelines.
 
 
 21
 Affirmed in part, reversed in part, and remanded with directions.
 
 
 22
 LAY, Chief Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, dissenting.
 
 
 23
 I respectfully dissent.
 
 
 24
 I would agree that double celling is not per se unconstitutional. The Supreme Court has so ruled. Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). However, this is not the holding of the district court so it is difficult to understand the need for this en banc rehearing.[1] The district court found that the effects of double celling (overcrowding) were causally related to the myriad of other deficiencies in the prison. The majority disagrees with the finding. The record is replete with the causal relationship between these deficiencies and the ongoing practice of double celling. The majority simply substitutes its judgment for that of the district court in finding no causality and in doing so violates the clearly erroneous rule. See Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).[2]
 
 
 25
 The difficulty I have in all of this is that at the time of the oral submission of this case in January of 1987, we were informed by the State of South Dakota that they had fully complied with the district court's order of May 31, 1984. The district court's ban on double celling was conditioned solely upon the overcrowding contributing to the many deficiencies in the prison itself. The district court's order makes clear that if the deficiencies were otherwise corrected the ban on double celling would not continue. At our request, the state furnished the court with the list of improvements in compliance with the district court's decree. I attach this list as an addendum. It is obvious that if the state has complied with the order of the district court, the totality of circumstances no longer exists and that double celling, absent a record of violence or assault, is permissible in South Dakota. Therefore, no viable issue remains on appeal. In light of these changed circumstances, the willingness for the en banc court to render a final judgment is inexplicable. The case should be remanded to the district court. The district court should determine the issue of compliance because this court has no means to provide an evidentiary record.[3]
 
 
 26
 There is another even more cogent reason for remanding this case to the district court. On remand the trial court may wish to consider the current use of double celling in both the intake and protective areas. During the long pendency of this case in this court, a district court judgment was entered on the first day of November 1986 on a jury verdict of $10,000 for a 19-year-old South Dakota inmate based upon the pervasive and reckless failure of the state to provide protection from sexual assault in the intake and protective areas where double celling is used. The case of Vosburg v. Solem, No. 87-5032/33SD was heard by a three judge panel of this court in the September term of court. I take judicial notice of this proceeding and report that the Attorney General of South Dakota has now discontinued double celling in the intake area. Evidence in that record shows that the inmate was sexually violated on December 22, 1982, January of 1983, April of 1983, and June of 1983. Evidence by other inmates showed nightly assaults upon young inmates. In the summer of 1981, an 18- or 19-year-old was raped three different times by his cell mate. He tried to commit suicide after those rapes. The record is replete ad nauseam with sexual assaults on younger inmates placed in double cells. The record shows that more than 500 crimes were investigated in the South Dakota prison last year; there were also reports of over 140 instances of fighting and assaults from 1984 to 1985.
 
 
 27
 Surely Judge Porter should have the opportunity to review this record and review his ban on double celling. This court provides a totally inadequate and uninformed forum to pass on the current need for double celling in South Dakota.
 
 
 28
 The policy of the federal courts is firmly established that we ought to decline to address a constitutional issue unless it is necessary. Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) ("We call to mind [a] cardinal rule governing the federal courts: ' " * * * never to anticipate a question of constitutional law in advance of the necessity of deciding it * * *." ' United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960), quoting Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)."). This rule has been stated innumerable times; its roots are almost as old as the federal courts themselves. Hayburn's Case, 2 U.S. (2 Dall.) 408, 409, 1 L.Ed. 436 (1792). To ignore the rule at this late date serves only to obscure our judicial role. The action of the court here is totally unnecessary. The issue is no longer ripe for review.
 
 
 29
 In view of the overall record, what the en banc court achieves today is meaningless to the case before us. Therefore, I must dissent.
 
 ADDENDUM
 SUPPLEMENTAL REPORT
 
 30
 The Court having requested certain additional information in the above cases, Appellants Carole Hillard, et al., by and through their attorney, hereby file this Supplemental Report.
 
 
 31
 IMPROVEMENTS AT THE SOUTH DAKOTA STATE PENITENTIARY REQUIRED BY THE COURT ORDER.
 
 
 32
 On July 8, 1985, the District Court issued its Final Order covering those areas where it felt improvements were necessary. The Appellants' compliance with that order is set forth below (what follows traces the final Order omitting only those provisions dealing with facilities other than the main prison in Sioux Falls):
 
 
 33
 I. Environmental Conditions--Housing.
 
 
 34
 A. Fire safety.
 
 
 35
 1. Fire exits and stairs.
 
 
 36
 a. The Appellants have provided new fire stairs from East Hall, Federal Hall, and West Hall.
 
 
 37
 b. The Appellants have provided an additional fire exit from East Hall.
 
 
 38
 c. The Appellants have provided an additional fire exit from West Hall.
 
 
 39
 2. Automatic unlocking system.
 
 
 40
 a. All cells used for inmate housing in East, West and Federal Halls are equipped with an automatic cell unlocking system.
 
 
 41
 3. Fire separation barriers.
 
 
 42
 a. Roll-up steel slat doors have been installed at the entrances to West and Federal Halls.
 
 
 43
 4. Emergency lights.
 
 
 44
 a. Emergency lights have been connected to the emergency generator.
 
 
 45
 b. Two additional exit lights over the doorways in the converted exit from West Hall and one over the new exit from East Hall have been installed.
 
 
 46
 5. Smoke and fire detection system.
 
 
 47
 a. The Appellants are continuing to maintain a fire alarm system and smoke detector system in East, West and Federal cell halls.
 
 
 48
 6. Fire evacuation drills.
 
 
 49
 a. The Appellants have conducted unannounced fire drills in East, West and Federal cells halls and other appropriate areas of the SDSP, the most recent being several weeks ago.
 
 
 50
 7. Other fire safety measures.
 
 
 51
 a. The Appellants are continuing to maintain smoke exhaust fans in good working order in East, West, and Federal cell halls.
 
 
 52
 b. The Appellants are continuing the use of fire retardant mattresses and pillows, and the posting of fire evacuation instructions in every cell.
 
 
 53
 c. The Appellants are continuing to maintain self-contained breathing apparatus for staff use in the event of an emergency evacuation.
 
 
 54
 d. The Appellants are continuing to submit to inspections by the South Dakota State Fire Marshal and shall continue to abate any deficiencies found as a result of such inspection.
 
 
 55
 B. Ventilation and heating system.
 
 
 56
 1. Cell ventilation and heating.
 
 
 57
 a. The Appellants have installed a new digital system to control ventilation and heating in each cell hall, installed screened damper grills on the exhaust vents in all cells, installed new exhaust fans on each tier in the pipe chases behind each cell hall and have installed new duct work to connect the cell exhaust vents to the exhaust fans.
 
 
 58
 2. West Hall shower.
 
 
 59
 a. The Appellants are continuing to maintain the West Hall shower in a safe and sanitary condition with adequate ventilation.
 
 
 60
 C. Overhead lighting and electrical wiring.
 
 
 61
 1. Cell lighting.
 
 
 62
 a. The overhead fluorescent fixtures in all cells have been replaced with larger fixtures to improve overall cell illumination.
 
 
 63
 2. Cell wiring.
 
 
 64
 a. The Appellants have provided properly grounded outlets in West Hall.
 
 
 65
 b. All cells now have two properly grounded double outlets.
 
 
 66
 3. Removal of jerry-rigged wiring.
 
 
 67
 a. Improper wiring jerry-rigged by inmates is prohibited in all cell areas.
 
 
 68
 D. Hot water and water control system.
 
 
 69
 1. The Appellants have installed a hot water system for individual cells in Federal Hall.
 
 
 70
 2. The Appellants have provided proper plugs for sinks in individual cell halls.
 
 
 71
 3. A temperature regulator has been installed on the main hot water line to East and Federal cell halls.
 
 
 72
 II. Environmental Conditions--Kitchen and Food Storage Area.
 
 
 73
 A. Milk pasteurization process.
 
 
 74
 1. The SDSP discontinued pasteurizing its own milk on November 12, 1984.
 
 
 75
 B. Food Storage.
 
 
 76
 1. Basement food storage.
 
 
 77
 a. All food storage areas are in good repair and are maintained in a clean, healthful and vermin free condition. The basement food storage area has been completely cleaned and painted, and all racks have had metal canopies installed to protect against the potential for leakage from the overhead pipes.
 
 
 78
 2. Kitchen food storage.
 
 
 79
 a. The Appellants have continued to maintain proper kitchen freezers and coolers.
 
 
 80
 b. The Appellants have continued to maintain proper methods of food storage in the kitchen.
 
 
 81
 C. Kitchen elevator.
 
 
 82
 1. The Appellants are continuing to maintain the kitchen elevator in safe operating condition and have installed safety buffer devices on the doors to prevent injuries.
 
 
 83
 2. The Appellants have submitted to inspections of the kitchen elevator at appropriate intervals and will abate any deficiencies found as a result of any such inspections.
 
 
 84
 D. General kitchen practices and conditions.
 
 
 85
 1. Ventilation.
 
 
 86
 a. The Appellants have provided for adequate kitchen ventilation by installation of a large makeup air unit in the kitchen area.
 
 
 87
 2. Kitchen fire safety.
 
 
 88
 a. All kitchen stove hoods continue to be maintained with ancillary fire protection systems.
 
 
 89
 3. Utensil repair and sanitation.
 
 
 90
 a. The Appellants are continuing to maintain kitchen pots, pans and dining utensils in good repair and in safe and sanitary condition.
 
 
 91
 4. Inmate access to the infirmary through the kitchen.
 
 
 92
 a. The Appellants are continuing to prohibit inmate access to the infirmary through the kitchen during normal operational hours. Escorted access is permitted through the kitchen area only during nights, weekends, holidays and emergencies.
 
 
 93
 5. Kitchen food defrosting.
 
 
 94
 a. The frozen food defrosting basin is maintained in a safe and healthful manner, free from potential back siphonage.
 
 
 95
 6. Other kitchen practices.
 
 
 96
 a. All inmate food service workers are required to wear appropriate hair restraints and proper footwear.
 
 
 97
 b. All ice machines are cleaned regularly and kept in sanitary condition.
 
 
 98
 c. No part of the kitchen area is utilized as a work or lounge or smoking area.
 
 
 99
 III. Environmental Conditions--Shops and Vocational Programs.
 
 
 100
 A. Welding shop.
 
 
 101
 1. The welding program has been transferred to facilities designed for that purpose at the Springfield Correctional Facility.
 
 
 102
 B. Furniture upholstery shop.
 
 
 103
 1. Ventilation systems in the upholstery shop have been repaired and regular cleaning and replacement schedules have been established for all air filters. A roof mounted exhaust fan has been installed in the upholstery shop to improve ventilation and fume removal.
 
 
 104
 2. Chemical cartridge masks are provided for inmates working in the paint stripping and spraying booths.
 
 
 105
 C. Proper storage of combustibles.
 
 
 106
 1. Combustible materials continue to be maintained in a specially designed storeroom in the upholstery shop.
 
 
 107
 D. Barbershop.
 
 
 108
 1. The barbershop continues to be maintained in a safe and sanitary condition.
 
 
 109
 E. Safety locking devices.
 
 
 110
 1. Appropriate safety devices continue to be maintained on machinery in the vocational shops.
 
 
 111
 F. Sawdust removal.
 
 
 112
 1. A sawdust removal system has been installed in the carpentry shop, and is fully operational.
 
 
 113
 IV. Environmental Conditions--Other Areas.
 
 
 114
 A. Underground corridor lighting.
 
 
 115
 1. Fifteen fluorescent lights in security casings have been added to the previous lighting system in the underground corridor, and the entire corridor has been painted white.
 
 
 116
 B. Sanitary conditions in the infirmary.
 
 
 117
 1. Proper sanitary conditions continue to be maintained in the infirmary. Plumbing on the X-ray developer and washtub has been reconfigured with an air gap installation to prevent potential back siphonage.
 
 
 118
 V. Medical and Dental Care.
 
 
 119
 A. Use of inmate workers.
 
 
 120
 1. Inmate workers no longer provide any type of medical or dental services, nor do they schedule appointments or have any other involvement in determining the access of other inmates to health care services or the operation of medical or dental equipment.
 
 
 121
 2. No inmate has access to the medical or dental records of other inmates.
 
 
 122
 B. Emergency medical care.
 
 
 123
 1. Protocols.
 
 
 124
 a. The Appellants are maintaining proper emergency care protocols, including a provision setting forth the identification system for the emergency medical technician (EMT) on duty.
 
 
 125
 2. Emergency staff.
 
 
 126
 a. The Appellants are providing that at least one certified EMT or registered nurse is on duty at the SDSP at all times.
 
 
 127
 3. Crash cart.
 
 
 128
 a. A "crash cart" is now on site at the SDSP. It includes a portable automatic emergency defibrillator and a portable trauma kit.
 
 
 129
 4. Resuscitation equipment.
 
 
 130
 a. The Appellants continue to maintain emergency resuscitation equipment, including ambu bags, oxygen tanks and masks, spare oxygen tanks, and CPR masks.
 
 
 131
 C. Prescription drugs.
 
 
 132
 1. Formulary.
 
 
 133
 a. The Appellants are maintaining an adequate formulary at the SDSP infirmary. The formulary serves as a general guide to prescription and nonprescription medications most commonly used at the SDSP.
 
 
 134
 2. Prohibitions on prescription of certain medication.
 
 
 135
 a. The Appellants continue not to prohibit the prescription of sleeping medications, pain relievers, minor tranquilizers, appetite suppressants, and cough medicines by qualified physicians when medically necessary in accordance with the general medication policies of the SDSP.
 
 
 136
 3. Limitations on prescription of certain medications.
 
 
 137
 a. The SDSP continues not to discourage or limit the prescription of anticonvulsive and antiasthmatic medications by qualified physicians when generally necessary and appropriate in accordance with the general medication policies of the SDSP.
 
 
 138
 4. Medication dispensation.
 
 
 139
 a. The Appellants continue to maintain a system for recording the administration or refusal of all prescribed medications.
 
 
 140
 5. Monitoring of inmates receiving major tranquilizers.
 
 
 141
 a. The Appellants provide appropriate medical monitoring of all inmates receiving major tranquilizers. In accordance with the health care protocols, inmates on major tranquilizers are monitored on a regular basis by medical personnel, and at other appropriate intervals as determined by the prescribing physician.
 
 
 142
 D. Protocols.
 
 
 143
 1. Appropriate health care protocols are maintained which govern the provision of health care services to the inmates at the SDSP.
 
 
 144
 E. Medical records.
 
 
 145
 1. The existing medical records at the SDSP have been reorganized and are maintained in the chart order specified in the health care policies and procedures.
 
 
 146
 F. Staff.
 
 
 147
 1. The SDSP continues to maintain adequate medical staff.
 
 
 148
 2. The Appellants provide twenty-four hour nursing staff coverage when an inmate needing nursing services is kept in the infirmary.
 
 
 149
 G. Financial constraints on medical and dental services.
 
 
 150
 1. The Appellants continue to provide necessary medical, surgical and dental care to inmates, as well as necessary prosthesis free of cost to indigent inmates.
 
 
 151
 2. Medical judgments of the SDSP medical staff regarding necessary treatments are not overridden by nonmedical staff.
 
 
 152
 VI. Psychiatric and Psychological Care.
 
 
 153
 A. Staff at the SDSP.
 
 
 154
 1. The Appellants have been unable to fill the second psychologist position at the SDSP. However, an outside psychologist was retained, under contract, and has been providing services to the inmates at the SDSP.
 
 
 155
 2. The Appellants have maintained the staffing ratio for correctional counselors, specialized counselors, and psychiatric services which existed as of May 31, 1984.VII. Intake Area.
 
 
 156
 A. The Appellants provide proper initial medical screening of all newly admitted inmates, in accordance with the penitentiary's health care policies and procedures.
 
 
 157
 VIII. Access to the Courts.
 
 
 158
 A. Two attorneys, retained under contract, continue to provide legal services to indigent inmates at the SDSP and the Springfield facility.
 
 DISTRICT COURT EVIDENTIARY HEARING
 
 159
 The Appellants have not made an application to the district court for an evidentiary hearing to determine whether the order prohibiting double celling can be rescinded in light of the improvements made at the SDSP.
 
 
 160
 COMMENTS OF SOUTH DAKOTA OFFICIALS CONCERNING RELEASE OF INMATES
 
 
 161
 Copies of two articles from the Sioux Falls, South Dakota, Argus Leader, appearing on October 23, 1986, and October 25, 1986, respectively, contain several comments by the then Governor and others concerning early release of inmates. The Argus Leader has the largest circulation of any newspaper in South Dakota.
 
 
 162
 A request has been made to the Argus Leader to further search its files and provide copies of any other articles concerning inmate release.
 
 
 163
 Those articles, if any, will be forwarded to the Court when available.
 
 
 164
 PROFILE OF INMATES RELEASED UNDER GOVERNOR'S COMMUTATION
 
 
 165
 The Appellants' Supplemental Brief indicated that thirty-seven inmates had been released in October, 1986, under the Governor's early release program. The actual number released was thirty-six; Appellants' counsel apologizes for the error. The inmate profile requested by the Court is attached. Also attached is a copy of the commutation agreement each inmate was required to sign and the Governor's commutation order.
 
 
 166
 Dated this 28th day of January, 1987.
 
 
 167
 /s/ Richard Dale
 
 Richard Dale
 Assistant Attorney General
 State Capitol
 Pierre, S.D. 57501-5090
 Telephone: (605) 773-3215
 Attorney for Appellants
 
 168
 McMILLIAN, Circuit Judge, dissenting.
 
 
 169
 I respectfully dissent.
 
 
 170
 First, the constitutional issue presented in this case may now be moot. Progress reports filed this year by the state indicate that conditions at the penitentiary have been significantly improved. The district court's remedial order prohibiting double-celling and adopting ACA rated capacity standards was expressly based upon the conditions existing at the time of the district court's decision in 1984. If the state has in fact made substantial progress in improving the very conditions which warranted the district court's remedial order, then the district court should be given the opportunity to assess the state's improvements and, if conditions have significantly improved, perhaps modify its remedial order. The prohibition against double-celling and the requirement that prison officials follow ACA rated capacity standards may no longer be necessary. Accordingly, I would remand the case to the district court for the limited purpose of holding an evidentiary hearing.
 
 
 171
 On the merits, the state has not argued that the district court's factual findings about the conditions at the penitentiary are clearly erroneous. Given the district court's comprehensive and detailed findings about the many serious deficiencies in the conditions of confinement, including the physical plant, security, staffing, sanitation, safety and fire hazards, overcrowding, violence, food services, and medical and other prisoner services, I would hold that the district court did not err in holding that, under these conditions, considered as a whole, double-celling was unconstitutional. Accordingly, I would affirm the remedial order of the district court prohibiting double-celling and adopting the ACA rated capacity standards for the reasons discussed in the panel majority opinion. Cody v. Hillard, 799 F.2d 447, 449-51 (8th Cir.1986) (Heaney, J.), citing French v. Owens, 777 F.2d 1250, 1252 (7th Cir.1985), cert. denied, --- U.S. ----, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986), Toussaint v. Yockey, 722 F.2d 1490, 1492 (9th Cir.1984), and Wellman v. Faulkner, 715 F.2d 269 (7th Cir.1983), cert. denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). Cf. Rhodes v. Chapman, 452 U.S. 337, 347-50, 101 S.Ct. 2392, 2399-2401, 69 L.Ed.2d 59 (1981) (given otherwise relatively good conditions at prison, double-celling held not unconstitutional).
 
 
 172
 This case is not about prisoner discomfort; it is about the minimum standards of humane imprisonment required by the eighth amendment. "[C]onditions [of confinement] that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S.Ct. at 2399. "But incarceration is not an open door for unconstitutional cruelty or neglect. Against that kind of penal condition, the Constitution and the federal courts, it is to be hoped, together remain as an available bastion." Id. at 369, 101 S.Ct. at 2411 (Blackmun, J., concurring in the judgment).
 
 
 
 [1]
 The District Court's order prohibits double-celling of even those inmates who voluntarily have chosen to share the same cell, and thus implies that such voluntary double-bunking constitutes an Eighth Amendment violation. The suggestion that such voluntary double-bunking constitutes cruel and unusual punishment under the standards announced in Rhodes and Whitley clearly is insupportable
 
 
 [1]
 The futility of the rehearing en banc requiring the judicial energies of ten judges is fully demonstrated on this record. The ill side effects of any en banc rehearing are disclosed here. The district court filed its memorandum opinion on May 31, 1984. On July 8, 1985, the district court filed its final order. Notice of appeal was filed on July 22, 1985. The case was submitted to the panel on February 13, 1986. At that time it was fully reviewed on the record concerning the totality of the circumstances. The panel decision was issued on September 2, 1986. It was later placed en banc and submitted to the court on January 12, 1987. Now a year and a half after this case was originally submitted to a panel of this court, the majority of the en banc court finally concludes that double celling in South Dakota is not per se impermissible. Such a decision at this late date in light of the changed circumstances is rendered in a vacuum. As will be explained, it is totally irrelevant to the facts which now exist
 
 
 [2]
 The majority simply disagrees with the district court's finding as to the relationship of double celling to the overall deficiencies. The district court found similar overcrowding conditions as existed in Campbell v. Cauthron, 623 F.2d 503, 505-07 (8th Cir.1980). The majority overlooks Judge Porter's statement that:
 This court's findings with respect to various conditions of confinement at the SDSP run contrary to the "generally favorable findings" cited in Rhodes: the ventilation system, especially regarding West Hall where the majority of double-celling exists, is inadequate; the heating system in all three cell halls is generally inadequate and fails to adequately control air temperatures throughout each cell hall; several inmates are double-celled in Federal Hall where there is no running hot water; there are no lounges or dayrooms available to ameliorate the effects of double-celling (see SDSP Study, Appendix A at 7, 12); the Warden at the SDSP testified that double-celling at the SDSP has placed undue burdens on various services, programs and maintenance activities with respect to the physical plant; the SDSP is grossly understaffed; overcrowding at the SDSP has a negative impact on the availability of jobs for a significant number of inmates; several unsanitary conditions exist in the kitchen and food storage areas; and system-wide deficiencies are present in the areas of physical and mental health care. These findings, despite other more favorable findings such as the generally adequate level of sanitation throughout the SDSP, the generally low tension among inmates and among inmates and staff, and the sincere efforts made by the SDSP administration and staff to maintain a healthful prison environment, constitute for the most part structural deficiencies of a permanent nature in numerous services, programs and in the physical plant at the SDSP. Many of these findings relating to structural deficiencies at the SDSP spring directly from the State-commissioned SDSP Study. The record in this case supports the conclusion that overcrowding, as evidenced by the extent of double-celling, substantially contributes to the substandard living conditions at the SDSP.
 Cody v. Hillard, 599 F.Supp. 1025, 1052 (D.S.D.1984).
 
 
 [3]
 The district court wrote some 83 pages carefully analyzing the overall deficiencies of the South Dakota prison system. In my judgment, it is one of the most thorough analytical district court opinions I have ever read. It holds, albeit reluctantly, that under the totality of circumstances the prison system in South Dakota is unconstitutional as violating the eighth amendment. It does not hold any specific area of the prison unconstitutional without reference to the whole of the inhumane conditions which existed. These findings were not appealed. The only finding the state appealed was the ban on double celling. When considered on the record as a whole, the majority ignores all of these findings on the simple, conclusory ground that the various findings are not related. On the face of this record, this does not rationally follow
 There is no question that courts are less competent to "administer" prisons than wardens and state correctional officers. But this does not mean that courts must continue to treat prisoners inhumanely without respect to their conditions of confinement. The "hands-off doctrine" no longer bars constitutional application inside the prison walls. The United States Supreme Court has acknowledged this as have various federal courts, including this court. Rhodes v. Chapman, 452 U.S. 337, 354, 101 S.Ct. 2392, 2403, 69 L.Ed.2d 59 (1981) ("Thus, the lower courts have learned from repeated investigation and bitter experience that judicial intervention is indispensable if constitutional dictates--not to mention considerations of basic humanity--are to be observed in the prisons." (Brennan, J., concurring) (emphasis in original)); Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) ("prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime"); Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ("[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." censorship of mail involves free speech); Morrissey v. Brewer, 408 U.S. 471, 480-82, 92 S.Ct. 2593, 2599-2601, 33 L.Ed.2d 484 (1972) (parole revocation, although it is not a criminal prosecution involves constitutional considerations); Campbell v. Cauthron, 623 F.2d 503, 505 (8th Cir.1980) (overcrowding, inadequate diet and forced religious indoctrination; court ordered its elimination); Finney v. Arkansas Bd. of Correction, 505 F.2d 194 (8th Cir.1974) (problems of housing, lack of medical care, torture, racial discrimination; some amelioration was insufficient); Jackson v. Bishop, 404 F.2d 571 (8th Cir.1968) (use of strap was cruel and unusual; injunction ordered); Campbell v. Miller, 787 F.2d 217, 227 n. 17 (7th Cir.) ("[O]ur deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute." declining to interfere with commissary account impoundment), cert. denied, --- U.S. ----, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); Abdul Wali v. Coughlin, 754 F.2d 1015, 1018 (2d Cir.1985) (preliminary injunction permitting inmates to receive critical report of prison conditions upheld); Battle v. Anderson, 708 F.2d 1523, 1539 (10th Cir.1983) (per curiam) (overcrowding, understaffing; ordered district court to retain jurisdiction and monitor compliance), cert. denied, 465 U.S. 1014, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984); Smith v. Sullivan, 611 F.2d 1039, 1044 (5th Cir.1980) (overcrowding; remanded for hearing to determine if it reached constitutional proportions); Nadeau v. Helgemoe, 561 F.2d 411, 419 (1st Cir.1977) (limitation of access to library cannot be arbitrary and capricious). To treat prisoners as mere numbers to be discarded as human waste is far from my understanding of the Constitution. Surely courts should not run prisons. But to those who have been so unfortunate as to violate the law, the Constitution no longer closes its eyes to the total process of dehumanization. Campbell v. Cauthron, 623 F.2d 503 (8th Cir.1980) (overcrowding, inadequate diet, forced religious inculcation); Burks v. Teasdale, 603 F.2d 59 (8th Cir.1979) (overcrowding; upheld enforcement of timetable for compliance and retention of jurisdiction by district court); c.f. Carpenter v. State, 536 F.2d 759, 763 (8th Cir.1976) (asserted first amendment violations carefully scrutinized, but no right to sexually explicit mail), cert. denied, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977). It is an old axiom that it is human nature to abuse power--nowhere is this more true than in the prison setting. It is not judicial activism to recognize constitutional intervention when the state refuses to provide humane treatment to those incarcerated. Federal judges who blindly interpret the hands-off doctrine to mean that the Constitution stops at the prison wall are grossly mistaken. A person who violates the law is separated from society as punishment for the crime committed. He serves time in a custodial setting. However, he is not sent to prison to have further punishment inflicted upon him by inhumane treatment. To close the eyes of judges by reference to the hands-off doctrine is a throwback to the Dark Ages.