**Wesley KITT, Steve Robbins, and Terrance O'Donnell, Plaintiffs,**

**v.**

**Howard FERGUSON and Harold Clarke, Defendants.**

**No. CIV 89–L–179.**

United States District Court, D. Nebraska.

June 13, 1990.

---

Craig L. Kelley, Omaha, Neb., for plaintiffs.

Marie C. Pawol, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOGUE, Senior District Judge, Sitting by Designation.

This case was tried to the Court on April 30 and May 1, 1990. Plaintiffs were represented by Craig L. Kelley, 2580 South 90th Street, Omaha, Nebraska 68124. Defendants were represented by Assistant Attorney General Marie C. Pawol, 2115 State Capitol, Lincoln, Nebraska 68509. Having heard the testimony and evidence presented at trial, and after careful consideration of the claims made with respect to the applicable law governing these matters, the Court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Plaintiffs, Wesley Kitt, Steve Robbins, and Terrance O'Donnell, are currently committed to the custody of the Nebraska Department of Correctional Services (DCS). At the commencement of this suit, the Plaintiffs were housed in B Bay at the Medium Security Unit (MSU) of the Nebraska State Penitentiary (NSP) in Lincoln, Nebraska.

2. Defendant Frank Gunter formerly served as Director of the DCS from March, 1984, until March, 1990. Gunter is presently the Executive Director of the Colorado Department of Corrections. Defendant Harold Clarke is Warden of the NSP.

3. The NSP is a male, maximum security prison which houses an average of 700 inmates who are assigned to either maximum or medium custody levels. Housing at the NSP is comprised of four main housing units, a segregation unit, and the MSU, which only houses medium custody level inmates.

4. Two hundred fifteen uniformed personnel serve as the prison's custody staff, or police force, responsible for institutional

security. The housing units are operated in accordance with a unit management system whereby a unit manager and unit supervisors are assigned to each housing unit. The unit management staff is responsible for the daily operation of the housing units and perform both security and treatment functions. All prison personnel undergo three to four weeks of training at the DCS training academy prior to employment and participate in regular ongoing training thereafter.

5. There is one unit supervisor assigned to each of three bays in the MSU on the first shift, 6 a.m. to 2 p.m., and the second shift, 2 p.m. to 10 p.m. Additionally, there is a correctional sergeant and a corporal who supervise the common areas and make regular rounds through the bays. On the third shift, 10 p.m. to 6 a.m., a correctional officer is assigned to each of the bays with a sergeant assigned to supervise them. On Monday through Friday from 8:00 a.m. to 4:30 p.m., there additionally is a Unit Supervisor II assigned to each of the bays, a lieutenant, and a Unit Manager for the entire MSU.

6. The MSU is a dormitory-style housing unit built in 1954. It underwent some renovation which was completed in 1985. There are three sleeping bays consisting of rows of beds and adjoining lockers. Each sleeping bay has adjacent toilet and shower rooms and a day room for leisure activities.

7. The MSU has a design capacity of 150 inmates, 50 per bay. Its present rated capacity, as determined by the State Fire Marshal, is a total of 195 inmates.[1] The population total of the MSU at the time of trial was 178 inmates.

8. Each bay sleeping area consists of 4900 square feet. The day room in A Bay is 1078 square feet. The day room for both B and C Bays is 1480 square feet.

9. In April, 1989, fifteen additional beds were added to A Bay, and ten additional beds were added each to B and C Bays. With the current additions, the inmate capacity level at MSU is 185, which represents a 23% increase over the design capacity of 150 inmates. Specific acts of reported violence among MSU inmates subsequent to double-bunking has not significantly increased over previous years.

10. The day rooms adjacent to each sleeping bay are separated by an installed sheetrock wall with double doors providing access to the sleeping bays. American Correction Association (ACA) Standard 2–4137 mandates as an *essential* standard that

> [d]ay rooms equivalent to a minimum of 35 square feet per inmate should be available to all inmates for reading, writing or table games. Tables should be provided which may also be used for dining. Circulation corridors in front of cells/rooms are not to be considered day room/leisure time space.

11. Adjacent to the day rooms contained in a separate room are toilet and sink facilities. Adjacent to the toilet and sink facilities is another separate room for showers. In B Bay, the toilet and shower facilities contain seven toilets, one urinal, eight sinks, and seven showers. ACA Standard 2–131 posits as an *important* standard that toilet and shower facilities should be available at a minimum of one operable toilet and shower for every eight occupants, and that one operable wash basin with hot and cold running water should be available for every six occupants.

12. Shower *and* toilet plumbing systems, replaced in 1985, are presently leaking in B Bay. It is clear that leaking has persisted for an extended period of time, as evidenced by the extensive ceiling stains and rags inserted in the ceiling to inhibit

1. There is conflicting testimony as to the design capacity and rated capacity of the MSU. Plaintiffs argue that the design capacity of MSU is 100 with a rated capacity of 150 (where the rated capacity is computed at 150% of design capacity). Defendants, on the other hand, argue that the design capacity is 150 and that the rated capacity is 195 (as determined by the State Fire Marshal). Because the State of Nebraska is responsible for determining the habitability of public buildings and the state's prison, any determination by state officials on whether or not a building is habitable according to building and safety codes has legal force and effect. Thus, the Court is compelled to accept the credibility of the state's witnesses, that the MSU has a rated capacity of 195.

the flow of waste waters. The area where the shower and toilet plumbing leaks from B Bay is an entryway to the MSU. Also within this area is an ice machine used for the dining hall and a hot water dispenser. The leaking waste water drips into buckets or on the floor within 1 to 4 feet of the hot water dispenser or ice machine respectively.

13. Sleeping areas within B Bay contains a floor space area of 7 feet by 8 feet for a total of 56 square feet. Areas where beds are double bunked would have one-half the total square footage available for areas occupied by single beds. ACA Standard 2–4131 posits as an *important* standard that a minimum floor area of 50 square feet should be available for each occupant. Inmates in each bay who are double-bunked are double-bunked only upon voluntary request.

14. Heating is supplied to the MSU from the NSP centralized physical plant. No thermostatic controls monitor, regulate or maintain the heat supply to the MSU. The heat supply is controlled by a valve which custody personnel must manually operate to regulate temperatures.

15. Air conditioning for the sleeping areas of B and C Bays is provided by centralized units located on the roof of the MSU with thermostatic temperature controls located one floor below in the Unit Management Office. The day rooms for B and C Bays are not air conditioned. The sleeping area and day room for A Bay is air conditioned by several individual window units.

16. The MSU does not have mechanical ventilation and circulation of outside air. The only method of ventilation is by opening windows. This method is used year-round. There are no exhaust fans in the rest rooms. Body waste odors are pervasive in the areas adjacent to the day rooms. ACA Standard 2–4131 posits as an *important* standard that multiple occupancy rooms should have circulation of at least 10 cubic feet of outside or recirculated filtered air per minute per occupant. Smoking is permitted within the MSU with the exception that one-half of the beds in A Bay are for nonsmokers.

17. Paint is currently peeling in B Bay. There is no evidence that the paint is leaded paint. The paint used at the NSP is latex paint.

18. Noise level surveys have been properly conducted pursuant to accreditation audits which indicate that noise levels in the MSU are within normal and safe limits. All personal radios used by inmates within any indoor location must be used with headphones.

19. Deficiencies exist in the flat roofing structure of the MSU. To correct the leaks caused by the deficiencies, $85,000 has been appropriated to resurface the entire roof of the MSU.

20. The MSU is equipped with smoke detection and fire alarm systems, which are inspected and tested on a regular basis. Fire drills are conducted quarterly. There is no automatic fire sprinkler system at the MSU.

21. There are two fire exits from the MSU sleeping areas. The main exit is through the double-doors separating the sleeping area from the day room. The second exit is through a single door located at the opposite end of the sleeping area from the main exit. The second exit is locked at all times. The only method of opening the second exit is by custody personnel either unlocking the door from inside the sleeping area or from outside the building. No automatic unlocking device is used on the second exit.

22. The food preparation area within the MSU totals slightly less than 900 square feet. This also includes food storage areas. ACA Standard 2–4143 posits as an *important* standard that excluding the food storage area "kitchen floor space should be the equivalent of 10 square feet per inmate; this may be reduced proportionally for larger facilities. Kitchen equipment and food storage facilities should be sufficient for the quantity of food prepared."

23. The MSU dining area, which can seat 232 people, has no ventilation other than windows, and an exhaust hood which only exits cooking smoke. ACA Standard

2–4154 posits as an *important* standard that eating halls should have at least 20 cubic feet of outside or recirculated filtered air per minute per human occupant.

24. All residents of the MSU have access to three meals per day planned by a licensed nutritionist. Meal quantities and food items are prepared in accordance with the number of inmates and staff present in the MSU, with an additional 15 percent of food quantities prepared each meal. Food shortages infrequently occur. In such an event, additional food items from the NSP main kitchen are supplied to replace any shortages. No MSU inmate has been denied any meal, or an adequate and healthful diet.

25. Any increase in inmate population at the MSU has also correspondingly increased the per diem budget for food, clothing and linen.

26. Limited recreational facilities are available to MSU inmates within the MSU itself. A weight room with individual lockers and a hobby room are available, in addition to the respective day areas of each bay. MSU inmates have access to the gymnasium, library, and chapel areas inside the NSP area which houses the maximum security inmates.

27. MSU inmates are required to be assigned to jobs or to educational programs within the prison, unless medically unassigned. A variety of work is available, with assignment based upon classification of custody level, skills, interest, availability and need.

28. Inmates, supervised by staff, perform daily, weekly, and monthly sanitation and maintenance duties. Repair work is performed by either staff or non-inmate contractors.

29. Health care services are available to MSU inmates. The NSP has a hospital and clinic staffed by a physician, two physician assistants, and several nurses performing triage as well as regular nursing services. Specialized medical needs are available to inmates through medical specialists in the community.

30. According to the Chief Medical Officer at the NSP, an average of 48 hours elapses after a request for medical attention before he sees non-serious patients. Serious medical matters receive immediate attention. Infectious and contagious diseases at the MSU have not occurred disproportionately higher than the maximum security units or disproportionately from the community.

31. According to the Chief Medical Officer, NSP has several HIV Positive inmates. Those inmates are within the general population, including the MSU.

32. There is no evidence that any of the Plaintiffs have been injured in any manner resulting from any of the conditions of their confinement in the MSU.

### CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this case which was brought pursuant to 42 U.S.C. § 1983, where the Plaintiffs complained of numerous conditions at the MSU, which they allege, under a totality of circumstances, would amount to a deprivation of their constitutional right to be free from cruel and unusual punishment. Even though the Plaintiffs' complaint is handwritten and lacks legal finesse, liberal treatment must be afforded pro se pleadings. *Williams v. White*, 897 F.2d 942, 944 (8th Cir.1990).

2. This Court has personal jurisdiction over the parties in this matter, and the Defendants are not entitled to a qualified immunity defense.

The defense of qualified immunity is unavailable in situations where: (1) the officials' conduct violates a clearly established statutory or constitutional right; (2) the official knew or should have known the right was clearly established; and (3) the official knew or should have known this conduct violated that right. *Brown v. Frey*, 889 F.2d 159, 165 (8th Cir.1989) *cert. denied*, —— U.S. ——, 110 S.Ct. 1156, 107 L.Ed.2d 1059 (1990).

To be clearly established, "the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Where there is a legitimate question that a particular right may exist under the facts of a case, the actions taken by prison officials cannot violate a clearly established law. *Brown*, 889 F.2d at 165.

It is clear in this case that Plaintiffs sufficiently established allegations which properly raises a legitimate question that their constitutional rights may have been violated, and that the Defendants knew or should have known that their conduct may have violated such rights. Therefore, Defendants are not entitled to a defense of qualified immunity, because there was a particularized showing that a "reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

▪ Moreover, Defendants' claim that they are not liable under the doctrine of respondeat superior is misplaced. While employees may be immune under the doctrine of respondeat superior, a superintendent or warden, with policy-making authority, can be held liable for operating a prison with unsanitary and inhumane conditions. *Finney v. Hutto*, 548 F.2d 740 (8th Cir. 1977), *aff'd*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Employees may be held liable, however, when their own actions amount to a deliberate indifference to or is a tacit authorization of constitutionally violative practices. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.1989), *citing William v. Willits*, 853 F.2d 586, 588 (8th Cir.1988).

3. The constitutional standards which govern this case were articulated in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) and its progeny. It is clear that conditions of confinement must not involve the "wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 348, 101 S.Ct. at 2400, *citing Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Additionally, conduct considered cruel and unusual punish-

ment "must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterized the conduct prohibited by the Cruel and Unusual Punishment Clause...." *Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir.1990), *quoting Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Conditions of confinement which may be cruel and unusual punishment must be viewed "from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. However, conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. *Id.* at 348, 101 S.Ct. at 2400.

Finally, this Court in considering an Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. Even if no single condition of confinement would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *Id.* at 363–64, 101 S.Ct. at 2407–08. *See also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir.1989).

▪ 4. Under the legal principles which must be followed to determine this case, this Court concludes that the complained of conditions at the MSU, under the totality of the circumstances, do not amount to a constitutional violation of the Plaintiffs' rights. However, the existing conditions at the MSU are potentially close to creating intolerable conditions for prison confinement unless remedial measures are implemented.

5. This Court visited the MSU. Pervasive body waste odors permeate the day areas and entryway. Waste water from toilets and showers were found leaking into buckets and onto the floor. Both of these problems can be simply remedied.

6. The Court recognizes that the MSU is not a contemporary building which has modern mechanical ventilation systems. Retrofitting a building of this age to provide ventilation or recirculation of filtered air may not be a high priority under the

strains of Nebraska's fiscal responsibilities. But simple and inexpensive exhaust fans in the rest rooms may provide some measure of remedy. Likewise, simple window air conditioners in the day areas of B and C Bays may be helpful. The evolving standards of decency which mark the progress of a maturing society may someday mandate that Nebraska retrofit the MSU for ventilation and circulation of air. Relying upon ventilation provided by opened windows increases the temperature variances within the MSU and ultimately may prove more costly for the necessary energy costs to compensate for such variances.

7. The Court heard testimony that the heating system for the entire MSU is controlled by a single manually controlled valve located in the Unit Management Office. Claims by MSU officials that a thermostatically controlled heating system is subject to inmate vandalism may have merit, but ignores other alternatives to protecting zone-thermostats from vandalism. It is clear that the existing system cannot respond to the wide variances in temperatures within the MSU due to the need to have windows open for ventilation and air circulation.

8. The Court heard evidence that the plumbing system at the MSU was completely renovated in 1985. Yet, the plumbing is leaking and waste water from toilets and showers are dripping into common use areas. The Court viewed the pipes which were in plain view, and notes the easy access to such pipes. Why the pipes are leaking, this Court, and no one else for that matter, seems to know. But clearly the problem is obvious and the remedy is simple.

9. The Court heard testimony that the only way the second exit from the sleeping bays can be opened in the event of fire is by custody personnel with a key from either the inside of the sleeping bay or from outside the building. Electronic door devices could perform the same function, but without a potentially life-threatening delay.

10. On the issue of insufficient food quantities and quality at the MSU, there is insufficient evidence that an inmate has been denied any meal or suffers from an inadequate diet which would result in a constitutional deprivation. *See Cody v. Hillard,* 830 F.2d 912, 914 (8th Cir.1987).

11. Throughout trial, Plaintiffs argued that the ACA standards mandate uniform compliance of both *essential* and *important* standards. Even though NSP has met all essential standards, and while the recommendation of ACA non-essential standards may be instructive in certain cases, they do not establish the constitutional minimums to ensure protection of a prisoner's rights. *Cody,* 830 F.2d at 914, *citing Bell v. Wolfish,* 441 U.S. 520, 543–44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). The fact that NSP attempts to comply with ACA standards as a goal is commendable. But in Eighth Amendment claims generalized opinions of experts [such as the ACA] cannot weigh as heavily in determining contemporary standards of decency as the public attitude toward a given condition or sanction. *Id. citing Rhodes,* 452 U.S. at 349 n. 13, 101 S.Ct. at 2409 n. 13.

12. This Court recognizes that federal courts traditionally have adopted a broad hands-off attitude toward problems of prison administration. *See e.g. Cody,* 830 F.2d at 913, *citing Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). The problems confronted by prison administrators are complex and not susceptible to resolution by judicial intervention. But the problems viewed by this Court are deemed problems in the physical plant at MSU. This Court is not attempting to intervene in prison administration or prison policies. Nor is this Court attempting to resolve these problems by decree.

13. Double-bunking, while akin to double-celling, can be viewed as cruel and unusual punishment only if it leads to deprivations of essential food, medical care, or sanitation, or if it increases violence among inmates. *Cody,* 830 F.2d at 914, *citing Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400. There are no facts in this case that Plaintiffs have been denied essential food, medical care, or personal hygiene, nor were

involved in increased violence among inmates. Moreover, double-bunking at the MSU is voluntary, unlike the involuntary double-celling addressed in *Rhodes* or in *Cody.*

14. Claims that MSU inmates suffered higher levels of infectious and contagious diseases is not supported by the evidence. Claims that delays in medical attention automatically results in a deprivation of constitutional rights are misplaced. A cognizable claim of denial of medical care under the Eighth Amendment must demonstrate that alleged acts or omissions are sufficiently harmful to prove a deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *see also Nitcher v. Cline,* No. 88–2816, slip. op. at 4 (8th Cir. April 15, 1990). There is insufficient evidence in this case which demonstrates a deliberate indifference to the medical needs of the Plaintiffs.

15. The Court is concerned about the presence of HIV Positive inmates in the NSP general population. While the Chief Medical Officer boasted at trial that NSP does not have a "full-blown case of AIDS," the Chief Medical Officer reluctantly admitted that several inmates at NSP have tested HIV Positive, and these inmates were among the general population. It is *not* a matter of whether a person has "full-blown" AIDS. It *is* a matter of whether a person has been tested HIV Positive, because such a person's bodily fluids, if it comes into contact with the blood of a non-infected person, *will* transmit the HIV Positive virus.

AIDS is a significant health problem in the United States. As society and medical professionals gain a deeper understanding about the risks of AIDS, some consistent facts emerge. First, HIV Positive carriers can develop AIDS, within varying degrees of time. Second, AIDS is fatal, but again within varying degrees of time. Third, the HIV Positive virus is transmitted through the contact of the infected carrier's bodily fluids with the blood of the non-infected person. Fourth, infections can occur, for example, through blood transfusions, common use of hypodermic needles, and

through sexual contact. Finally, there is no known cure for AIDS.

Society is also gaining a deeper understanding about the complex problems of prisons and prison life. Society recognizes that violence, oftentimes committed as sexual violence, is a fact of prison life. Homosexuality and predatory behaviors in prisons invites exposure to the HIV Positive virus.

It is clear that in contemporary society in a non-prison environment, segregation of HIV Positive carriers is an impermissible act by government. However, prison environments are not the same as the social environment found in the community. The potential for violence within a prison perpetuated against HIV Positive carriers, or by HIV Positive carriers against non-infected inmates, is increased as the tensions of prison life are further exacerbated by the pressures of any overburdened prison system.

The legal and moral dimensions of AIDS in society are difficult. The legal and moral dimensions of the potential for AIDS to develop within a prison system stretches the balance between constitutional protection and infringement to the theoretical limits of the law. This Court recognizes this and can offer no guidance other than a recommendation that prison officials, not only in Nebraska but in all states, must eventually address the potential hazards of AIDS and the HIV Positive virus within a prison community.

16. Finally, the Court recognizes the fiscal burdens prisons place on state revenues. Across the nation states are finding larger and more clamorous constituencies competing for government revenues. Choices have to be made between equally legitimate claims. There is no obligation for the state to provide a "country club" setting for prisoners, but the state must adhere to standards of common decency as herein discussed.

As the standards of decency which mark the progress of society evolves, the State of Nebraska may someday find the condition at MSU violative of the prisoners' rights unless steps are taken now, and in

the future, to correct some of the most glaring problems in the physical plant. Continued blindness to such things as leaking waste water pipes, pervasive body waste odors, etc., under the guise of budgetary constraints can potentially amount to obduracy and wantonness for the interest and safety of inmates. *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084.

Presently, the problems which do exist at the MSU do not amount, under the totality of the circumstances, to a wanton or unnecessary infliction of pain. *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. Therefore, it is the conclusion of this Court that conditions at the MSU cannot be said to be cruel and unusual under the contemporary standards of the Eighth Amendment, and judgment in favor of the Defendants will be entered accordingly.