GIGI GORDON, Plaintiff-Appellee, v. THE CHICAGO TRANSIT AUTHOR-
ITY, Defendant-Appellant.

First District (2nd Division)   No. 83—2448

Opinion filed October 30, 1984.

Edward J. Egan and Joyce A. Hughes, both of Chicago, for appellant.

Cooney and Stenn, of Chicago (Kevin J. Conway and Doris Adkins Carter, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant Chicago Transit Authority (CTA) liable in negligence for injuries sustained by plaintiff when she was assaulted, raped and robbed while a passenger aboard a CTA rapid transit train. CTA raises as issues whether the circuit court erred by: (1) denying CTA's motion for a directed verdict; (2) giving plaintiff's instruction on CTA's duty of care; and (3) permitting testimony by plaintiff's expert as to the ultimate issues in the case.

Plaintiff, 29 years old at the time of trial, testified that at about 7 p.m. on March 8, 1977, she boarded an eight-car southbound Howard North-South rapid transit "A" train at the Loyola station. She was sitting in the center of the third car when a young, muscular black man sat beside her, touched her legs, moved her dress up, and said vulgar things. She told him to get away and stood up to leave, which he physically prevented, saying he had a knife in his pocket. She again tried to stand but was forced to sit down, as he continued to play with her legs. He then grabbed her left arm, twisted it, and, after she screamed and tried to escape, he forced her into the unoccupied, unlighted motorman's compartment at the end of the car. He unzipped her dress, touched her "everywhere," and raped her. She screamed again. The rape continued until the train was close to the Belmont stop. She fought and struggled, but feared for her life. After the rape, he went through her purse, took her money, and told her to face the corner and not turn around until the Fullerton stop. When the assailant had gone, she ran through the cars to the front of the

train, pounded on the motorman's booth and, at Fullerton, the motorman escorted her from the train to the station ticket agent. She was taken to a hospital where she was examined, but was not admitted. She was given pills to take in the event of pregnancy.

On cross-examination, plaintiff stated that she has received no medical treatment since being examined at the hospital following the attack. From the time she entered the train that day, she never saw the conductor. She first noticed her assailant before the train stopped at Argyle. There were six to eight people in the car when she entered, and only when her assailant sat beside her did she notice they were gone. She did not see them get off. No other passengers were in the car during the attack.

The motorman of the train involved testified that when plaintiff approached him to report the rape, she was in tears but was not in disarray. He radioed his controller, who then called the ambulance and police. He escorted her from the train to the ticket agent. He later filed a report of the incident. He has been a motorman on the Howard line for 11 to 12 years, and this was the only rape reported aboard one of his trains. There are six "A" train stops between Loyola and Fullerton. The run between Wilson and Belmont takes approximately three minutes. "Trimming" a motorman's cab refers to adapting it for passenger use by locking the door into the face of the train and letting the seat down. CTA required unused cabs to be trimmed and lighted.

CTA's director of special investigations for security investigated CTA employees only and was not concerned with passenger safety. The uniformed personnel section of the department was responsible for plant and property maintenance and protection, not with passenger safety. The only relevant crime pattern statistics were maintained by the Mass Transit Unit of the Chicago police department (MTU). No CTA unit was responsible only for passenger protection. On cross-examination, the director noted that the MTU patrols rapid transit trains and platforms and investigates crimes on the rapid transit system.

Interrogatories were answered by CTA and read into the record. They detailed 21 reported criminal incidents occurring between March 8, 1976, and November 1, 1976, on the subject rapid transit line between the Loyola and Fullerton stops, involving crimes against persons. None involved a rape or attempted rape.

Plaintiff also presented the testimony of a witness who purported to be an expert on transit crimes. He had been a CTA transit security officer for 12 years and also a military and railroad policeman. He

had attended numerous courses and conferences related to law enforcement and security and was personally acquainted with the CTA security system as it existed on the date of the subject incident. In his opinion, the list of 21 incidents provided by CTA in its interrogatory answer was incomplete. Prior to 1977, CTA did not analyze its own crime statistics, but maintained a chronological file of all incidents that came to its attention from police reports, security department reports, complaint letters, and employee reports, to serve as a source of information when passengers made claims against CTA. In his opinion, CTA has "the most complete information available to it, and if properly used, that information could be the best source of compiling crime analysis studies and determining what measures could be taken to prevent crime ***." If the motorman's cab had been closed and access to the compartment denied, "it would have eliminated a place of concealment for the offender and the crime would very likely not have been committed," based upon his own knowledge of the CTA and on a 1972 study of CTA crime made by the Carnegie-Mellon Institute, which analyzed CTA crime and conditions and efforts being made to combat crime. The study, of which CTA was aware, recommended certain improvements, including the elimination of "hide architecture" by means of the "proper closure of unused motorman's booths." The Howard section of the North-South line has a high crime rate, and many crimes against persons occur between 5 and 10 p.m. By knowing where problems are, CTA could direct efforts at the most troublesome spots and times. Patrol activities and station checks could be directed on the basis of these statistics; this was not done, however. Passengers who are alone in cars provide a "high potential" for crime, and "[w]omen are particularly vulnerable." The low volume of southbound travel at the time of the occurrence here, along with the use of an eight-car train, meant that passengers "will be widely scattered" and increased the possibility that passengers would be left alone in cars.

On cross-examination, the above witness testified to the operations of the MTU. He admitted that he personally has a lawsuit pending against CTA, and had been previously involved in several suits against CTA in his capacity as recording secretary for the Amalgamated Transit Union.

A clinical psychologist and professor in the department of neurology and psychiatry at Northwestern University Medical School testified for plaintiff. He initially examined plaintiff at the request of her attorney on December 10, 1981, after she had been subjected to a battery of psychological tests. In his opinion, there was a "significant ef-

fect upon her intellectual functioning of the presence of a very high level of anxiety, agitation *** an almost panic-like quality." Plaintiff's view of the world as an "assaultive, threatening, attacking, power," left her "depressed, despondent, dispirited." These psychological effects are such as would have resulted from her 1977 attack on the train. He found her condition to be "a chronic debilitating anxiety reaction, secondary to the CTA train assault in 1977." This condition would affect her throughout her life; her prognosis was "guarded," as it was unlikely that she would return to her pre-1977 state.

The CTA conductor on the third or fourth car of the subject eight-car train on March 8, 1977, testified for CTA. Plaintiff, who came from the "rear cars," approached him and said, "I have been raped." He said nothing; she turned from him and went to the motorman in the first car. She looked "fine" to him. "[E]verything was normal" prior to her report. He saw no suspicious person on the platform or train. There had been nothing unusual with anybody getting on or off the train. He was not equipped with a radio; if anything was wrong, he would go to the motorman, who would make the call. He had been trained to assist "people in distress." He was not supposed to leave his position while the train was in operation; the only time he goes from car to car is at the main station when changing signs on the train.

A Chicago police detective investigated the instant rape and robbery report. At the hospital, plaintiff told him she didn't want to cooperate with police or take part in an investigation to apprehend the offender.

The director of service for the CTA, a CTA employee for 32 years, testified that he is responsible for the ongoing operation of all buses and trains. The CTA Howard-Englewood-Jackson, or North-South, line averages between 100,000 to 200,000 passengers per day. CTA rules provide that a conductor must be positioned between the third and fourth cars of an eight-car train. From this position, the conductor can see the "yellow safety stripe" on the platform which indicates that the doors of the train can be safely opened. A conductor is responsible for passengers entering and leaving the train, and "for the assistance that he can give to a passenger, or for any unusual occurrence ***." The normal running time from Wilson to Belmont is 3½-4½ minutes. All CTA employees are responsible "to give safety to passengers, regardless of what position they're in." It was not the conductor's job, however, to walk through the train to patrol for criminal activity, which would not be feasible and would violate CTA rules. The CTA security department protected CTA property and employees;

security provided by riding the trains was the responsibility of MTU.

The Chicago police commander who in 1977 headed the special operations group, which included the MTU, testified for the CTA. The MTU consisted of about 300 police officers responsible for providing safety and security to the patrons and employees of the CTA. The MTU operated by maintaining fixed posts at certain rapid transit stations, having uniformed officers ride various trains and check platforms and train conditions, and maintaining a technical undercover operation wherein officers act as "decoys" to catch criminals. From 1974 through 1977 the MTU kept internal records relating to crime on the CTA, in order to determine resource allocation. People were put where they were most needed. While he commanded the MTU, no rapes on a moving train on any line were reported prior to March 8, 1977. He was also unaware of the commission of any crime in an unoccupied motorman's booth.

A clinical psychologist testified for the CTA that he reviewed plaintiff's clinical psychologist's testing of plaintiff and found "quite a few deficiencies." Specifically, he questioned the fact that the psychological evaluation was not done over a longer period of time. On the basis of the tests given her, it would be impossible to render an opinion with any degree of scientific accuracy as to plaintiff's psychological impairment.

The jury returned a verdict in plaintiff's favor, assessing her damages at $200,000. Judgment was entered on the verdict on June 29, 1983. Defendant's timely post-trial motion was denied on September 12, 1983. This appeal followed.

I

■ CTA initially contends that the circuit court erred in denying its motion for a directed verdict, since the evidence did not show that CTA reasonably could have foreseen that a passenger would be raped aboard a moving rapid transit train. As a common carrier, CTA is bound to exercise a high degree of care toward its passengers and is responsible to prevent injuries to them which reasonably could have been foreseen and avoided; CTA is liable for an assault or other misconduct by one passenger which injures another where it has reason to anticipate the misconduct but fails to exercise the degree of care and vigilance practicable under the circumstances to prevent the injury. (*McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280, 285, 371 N.E.2d 625, quoting *Watson v. Chicago Transit Authority* (1972), 52 Ill. 2d 503, 505, 288 N.E.2d 476.) To establish reasonable foreseeability, more than the mere possibility of an occurrence must be

shown. *Ortiz v. City of Chicago* (1979), 79 Ill. App. 3d 902, 907, 398 N.E.2d 1007.

The record reveals that passenger volume was low at 7 p.m. on the subject CTA line. In view of CTA's use of eight-car trains at that hour, it was reasonably foreseeable that an assailant and victim could be left alone in a car and that few, if any, other passengers would enter the car at three consecutive stations, as happened here. CTA rules required conductors to remain at certain fixed positions and not to patrol the train, thus rendering the possibility of an attack on an isolated passenger more likely. At the time of the incident, CTA was aware that many crimes against persons take place on the rapid transit trains between 5 and 10 p.m. A witness testified that the subject line sustained a high crime rate. This was buttressed by evidence that, between March and November 1976, 21 crimes against persons were reported on this same route. Although none of these crimes was a rape, many of the victims were women. Also significant was the fact that CTA knew, or should have known, that a motorman's booth opened for passenger use provided a place of concealment which increased the opportunities for criminal activity. Crime statistics were at CTA's disposal which could have provided a basis for an effective deployment of resources and personnel to prevent transit crimes against persons.

In *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497, plaintiff was assaulted, robbed, and raped while waiting for a train at the carrier's suburban train station. Evidence showed that the station, near a "hobo jungle," was frequented by vagrants and other "undesirable characters." Although plaintiff had previously complained to the carrier's agents about this problem, the carrier did not assign an attendant to the station. No evidence was presented that any prior rapes or other criminal activity had taken place at the station. Nevertheless, the supreme court found that the carrier reasonably should have anticipated the possibility of an attack from the condition it permitted to exist at and around its station (383 Ill. 366, 377), and upheld plaintiff's judgment, finding that it was for the jury to determine whether defendant anticipated, or should have anticipated, the attack (383 Ill. 366, 375). Significantly, the carrier's duty to a passenger on the station premises was the exercise only of ordinary care, whereas the duty to a passenger on a train, as here, is the highest degree of care for her protection. (383 Ill. 366, 374.) In *Haynes v. Chicago Transit Authority* (1978), 59 Ill. App. 3d 997, 376 N.E.2d 680, plaintiff passenger was robbed and beaten on defendant carrier's elevated train station after he had alighted from a train at 3 a.m. No

CTA agent or employee was then on duty. Crime statistics admitted into evidence showed that three robberies had taken place at that station and two adjacent stations over a one-year period. The appellate court affirmed the judgment for plaintiff, noting that "[k]nowledge of conditions which are likely to result in an assault upon a passenger, or which constitute a source of potential danger, imposes the duty of active vigilance on the part of the carrier's agents and the adoption of such steps as are warranted in the light of existing hazards." 59 Ill. App. 3d 997, 1000.

By virtue of the evidence in the present case, when considered together with the above-cited authorities, the circuit court properly submitted the question of CTA's liability to the jury. Despite the absence of evidence indicating that prior rapes had occurred aboard moving rapid transit trains, there was sufficient evidence to support the conclusion that CTA, by reason of the physical conditions conducive to passenger isolation and the prior pattern of criminal activity aboard its trains, should have anticipated the potential danger of such an attack and taken measures to minimize the risk.

## II

CTA next assigns error to the circuit court's giving plaintiff's instruction No. 14 on duty of care as follows:

"The Defendant, CTA, has the duty to exercise the highest degree of care consistent with the type of vehicle used and the practical operation of its business as a common carrier by elevated train to protect its passengers while they were on its train from assault, injury and abuse from fellow passengers, of which it knew, or should have anticipated, from facts and circumstances known to it.

Since that obligation cannot be delegated to another, it is not a defense for the CTA that another person, including the City of Chicago Police Department, failed to protect the CTA's passengers while they were on the CTA train from assault, injury and abuse from fellow passengers, of which the CTA knew, or should have anticipated from facts and circumstances known to it.

Now, when I use the term 'cannot be delegated' in these instructions, I mean that the duty must be performed by the CTA and cannot be left to some other person, including the City of Chicago Police Department."

CTA urges that this instruction contravenes Supreme Court Rule 239(a), which provides that, where applicable, Illinois Pattern Jury In-

structions (IPI) are to be used and non-IPI instructions, if appropriate, must be "simple, brief, impartial, and free from argument." (87 Ill. 2d R. 239(a).) The foregoing instruction was taken, in part, from IPI Civil No. 100.03 (2d ed. 1971). It is improper to give a non-IPI instruction where an IPI instruction on the same subject is available. (*Seibert v. Grana* (1968), 102 Ill. App. 2d 283, 285, 243 N.E.2d 538.) Where a "unique factual situation or point of law" is presented, a non-IPI instruction may be given if it is carefully evaluated for its accuracy and its effect on the jury. (*Dezort v. Village of Hinsdale* (1979), 77 Ill. App. 3d 775, 777, 396 N.E.2d 855.) Although an instruction accurately states the law, it may not be given if it is misleading or argumentative. *Illinois State Trust Co. v. Walker Manufacturing Co.* (1979), 73 Ill. App. 3d 585, 592, 392 N.E.2d 70.

As noted, the first paragraph of the given instruction is actually IPI Civil No. 100.03. The subsequent paragraphs, however, are non-IPI and cover a subject matter, delegation of duty, not available as an IPI instruction. These paragraphs accurately state the law with respect to the nondelegability of a common carrier's duty to its passengers. (See *Stewart v. Beegun* (1970), 126 Ill. App. 2d 120, 127, 261 N.E.2d 491; *Cobb v. Marshall Field & Co.* (1959), 22 Ill. App. 2d 143, 153-54, 159 N.E.2d 520.) CTA concedes that its legal duty of care is nondelegable, but insists that these paragraphs are argumentative in that they constitute a "negative" instruction which singles out a particular item of evidence—testimony regarding the MTU—for comment. (See *Heep v. Mason* (1968), 100 Ill. App. 2d 142, 147-49, 241 N.E.2d 196.) In the case CTA cites, however, the "negative" instruction, properly refused by the court there, specifically would have urged the jury to entirely disregard a particular item of evidence. (*Heep v. Mason* (1968), 100 Ill. App. 2d 142, 241 N.E.2d 196.) Here, by contrast, the jury was not instructed to entirely disregard evidence concerning the MTU, but only that such evidence was not a defense; the jury was thus free to consider this evidence for all other purposes for which it was probative.

CTA also suggests that plaintiff's instruction No. 14 was improper because the subject evidence was "injected" into the case by plaintiff. MTU was initially mentioned during the direct examination of one of plaintiff's witnesses, who testified that the only crime pattern statistics relating to mass transit were kept by the MTU. CTA, however, went considerably beyond such incidental reference and cross-examined this witness regarding the purposes and functions of the MTU. CTA subsequently expanded upon this theme during its direct examination of the MTU police commander at the time of the instant at-

tack. The nature and scope of the evidence adduced by CTA relating to the MTU could have given the jury the impression that MTU's efforts met CTA's duty of care toward its patrons. Amplification of the IPI instructions was appropriate under the circumstances. (See *Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 857-58, 417 N.E.2d 1099.) A non-IPI instruction, nearly identical to that given here, was found proper in *Turney v. Ford Motor Co.* (1981), 94 Ill. App. 3d 678, 684, 418 N.E.2d 1079. In that case, the verdict favored defendant manufacturer who had tendered the objectionable instruction. The appellate court there held that the instruction correctly stated Illinois law; it did not indicate whether the instruction was unduly argumentative. The present instruction correctly stated the law, was not argumentative, and was necessitated by the circumstances of the case. We find no error.

### III

■ CTA's final point addresses the proposition that the circuit court committed reversible error by permitting plaintiff's transit police witness to testify as an expert. CTA failed to object at trial to this witness' qualification as an expert, thereby waiving error in this regard for purposes of appeal. (*Abramson v. Levinson* (1969), 112 Ill. App. 2d 42, 45-46, 250 N.E.2d 796, *cert. denied* (1970), 398 U.S. 950, 26 L. Ed. 2d 290, 90 S. Ct. 1868; *People v. Davis* (1984), 123 Ill. App. 3d 349, 354-55, 462 N.E.2d 824.) Notwithstanding this waiver, the witness was sufficiently qualified.

His testimony related to the profession of public transit security, his knowledge of which certainly exceeded that of the average juror. His years of experience as a transit security officer, railroad and military policeman and police dispatcher, as well as his training in these fields, qualified him to render an opinion on the subject of rapid transit security. (See *Allen v. City of Ottawa* (1980), 80 Ill. App. 3d 1032, 1035, 400 N.E.2d 629; *First National Bank v. Sousanes* (1981), 96 Ill. App. 3d 1047, 422 N.E.2d 188.) His testimony, that industry standards had been developed with respect to mass transit and that transit security was a "well developed specialty" with clearly defined standards and objectives, established a foundation for the admission of his opinion testimony.

CTA maintains that the expert's testimony lacked a proper foundation in that it was based on a report not admitted into evidence and with which, in any event, the witness disagreed. The witness' opinion, that "the crime would very likely not have been committed" if the motorman's cab had been closed, was based on his own knowledge of

the CTA and on a 1972 study of the CTA made by the Carnegie-Mellon Institute, however. As to use of the Carnegie-Mellon report, on cross-examination counsel for CTA himself extensively quoted statistics from this same report which tended to favor CTA's position.

■ CTA also argues that the witness based his opinion on the list of crime incidents reported from March 1976 to October 1976, with some of which he disagreed. In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, the supreme court adopted Rules 703 and 705 of the Federal Rules of Evidence. Rule 703 permits an expert to testify to an opinion not based on any facts in evidence, so long as the facts are customarily relied on by experts in the field to form opinions; Rule 705 allows an expert to render an opinion without disclosing the underlying facts, unless required to do so by the court or on cross-examination. Here, the basis of the expert's opinion was disclosed on direct examination. The witness' disagreement with portions of the report did not render his opinion without foundation. There is no requirement that experts accept statistics, reports, or the conclusions of others on an "all-or-nothing" basis when formulating their own opinions. The nature of the disagreement with the report was stated by the witness, who said further that his opinion was based on his own knowledge and experience. The opinion testimony was properly admitted, as a foundation therefor had been established.[1]

■ CTA next urges that the opinion testimony, to the effect that the crime would not have been committed if the cab had been closed, went to the ultimate issue of CTA's liability, which did not require the testimony of an expert, citing *Arnold N. May Builders, Inc. v. Bruketta* (1978), 60 Ill. App. 3d 926, 929, 377 N.E.2d 579. Opinion testimony as to the ultimate issue is admissible in Illinois; however, a stricter standard of admissibility applies. As the appellate court stated in *Bruketta*, "a shifting standard of admissibility must be applied as the opinion evidence shifts from answering questions on the outer rim of relevance toward answering the question at the central hub of the controversy." (60 Ill. App. 3d 926, 930-31.) CTA contends that testimony relating to the open motorman's cab providing a place of concealment and thereby increasing the likelihood of criminal activity was a conclusion properly left for the jury to draw from factual evidence which was not complex or difficult to understand. A trial court is af-

---

[1]The witness, Timothy O'Mahoney, also acceptably testified as to the incidence of on-board CTA crime in *McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280, 284, 371 N.E.2d 625.

forded "a wide area of discretion in permitting expert testimony which would aid the triers of fact in their understanding of the issues even though they might have a general knowledge of the subject matter." (*Stanley v. Board of Education* (1973), 9 Ill. App. 3d 963, 974, 293 N.E.2d 417.) Here, plaintiff's witness was qualified as an expert on mass transit security by virtue of his knowledge, training, and experience; his opinion, though arguably "obvious," dealt in part with train equipment and architecture which could have shed some light on the factual matters in evidence and thereby assisted the jury in its consideration of the issues. There was no error in permitting this testimony.

CTA also claims prejudice through testimony that CTA's doing or not doing certain things would have made a "difference" insofar as the attack was concerned. In *Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 201-03, 323 N.E.2d 62, relied upon by CTA, the appellate court held opinion testimony that a driver there "could have" avoided the subject accident by turning his vehicle was improperly admitted. There, however, the questioned testimony was that of a 15-year-old lay eyewitness stating his conclusion on a "crucial ultimate fact" and was unresponsive. (*Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 203; see also *La Salle National Bank v. First City Corp.* (1978), 58 Ill. App. 3d 575, 577, 374 N.E.2d 913.) Here, by contrast, the witness had been properly qualified as an expert. His opinions were not objectionable simply because they related to the ultimate facts at issue. (*Merchants National Bank v. Elgin, Joliet & Eastern Ry.* (1971), 49 Ill. 2d 118, 120-22, 273 N.E.2d 809; *First National Bank v. Sousanes* (1981), 96 Ill. App. 3d 1047, 422 N.E.2d 188.) Moreover, expert opinion testimony which is speculative or premised upon facts assumed to be true is admissible. (*Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504; *Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 517-18, 388 N.E.2d 844.) The testimony here was properly admitted.

In conclusion, it must be noted that although some of the expert's testimony bordered upon being inadmissible, it cannot be said that the circuit court, endowed with wide discretion in this regard, erred in admitting it. In any event, the most significant evidence of foreseeability—the surrounding facts and circumstances which did or should have alerted CTA to the danger of such an attack—was presented independently of this witness: the length of the train; CTA rules relating to the responsibilities of conductors and motormen; the physical characteristics of "trimmed" motormen's booths; and the prior record of criminal incidents on the subject rapid transit line. CTA's argument

that affirmance of the judgment here would be tantamount to making CTA an insurer of the safety of its patrons must be rejected. Sufficient evidence existed to permit the jury to consider whether CTA should have anticipated the instant attack from the particular circumstances in this case of which it was or should have been aware.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.