**Willard Ralph VOSBURG, Appellee,**

v.

**Herman SOLEM and Richard Rist, Appellants.**

**Nos. 87–5032, 87–5033.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 31, 1987.

Decided April 27, 1988.

Opinion on Denial of Rehearing June 16, 1988.

John W. Bastian, Pierre, S.D., for appellants.

Michael J. Schaffer, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, MAGILL, Circuit Judge, and LARSON, Senior District Judge.[*]

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

LAY, Chief Judge.

Willard Vosburg brought this 42 U.S.C. § 1983 (1982) action, seeking monetary and injunctive relief. Vosburg claims that Herman Solem, Warden of the South Dakota State Penitentiary, and Richard D. Rist, Associate Warden, violated his right to be free from cruel and unusual punishment. Following a five-day trial, the jury returned a verdict awarding Vosburg $10,000 on his section 1983 claim. We affirm the judgment on the verdict, award attorney's fees and post-verdict interest, and we remand the case to the district court with directions to dismiss the prayer for injunctive relief as moot.

**Background**

Vosburg entered the South Dakota State Penitentiary on December 16, 1982, to begin serving his sentence for possession of a stolen motor vehicle. It was his first time in prison. At the time, Vosburg was nineteen years old. He weighed approximately 135 pounds.

Two days after Vosburg entered the penitentiary, Edward Abbenhaus was brought to the penitentiary to serve out his sentence. Abbenhaus had killed his mother by strangling her. Vosburg and Abbenhaus met in the "intake area" of the penitentiary. Abbenhaus soon asked Vosburg to share a cell ("double cell") with him. At that time, the penitentiary did not have a policy of segregating inmates in the intake area based upon the nature of their crime, criminal record, or psychological profile. With the prison officials' approval, Vosburg was placed in a cell with Abbenhaus.

Four days after Vosburg and Abbenhaus began double celling, Abbenhaus assaulted Vosburg. Abbenhaus shoved a piece of cloth into Vosburg's mouth and raped him. Word of Vosburg's rape spread throughout the prison. Vosburg was sexually assaulted again on three separate occasions by three other inmates.

After his release in February of 1984, Vosburg brought this section 1983 action.

Following the return of the jury's verdict, the district court [1] took Vosburg's requests for injunctive relief under advisement. After several months' consideration, the district court granted Vosburg partial injunctive relief, requiring defendants to report to county and state law enforcement officials all cases in which the prison authorities had reasonable cause to believe that a rape had occurred in the penitentiary. The district court, however, denied Vosburg's request for an injunction prohibiting double celling inmates in the intake and protective custody areas of the penitentiary. The district court also denied defendants' motions for judgment notwithstanding the verdict and a new trial, and awarded Vosburg attorney's fees and costs under 42 U.S.C. § 1988.

**Liability**

The prison officials urge this court to reverse the district court's denial of their motion for a judgment n.o.v. on the ground that Vosburg failed to prove that they acted with reckless disregard of his right to protection from attacks of other inmates.[2] The district court submitted the issue of liability to the jury under the following instruction:

Prison officials may be liable for a violation of a prisoner's civil rights where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive him of that right, or if they act with reckless disregard of this right.

Reckless disregard of a prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk.

A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or to isolated incidents, but it may be established by much less than

---

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. The defendants also appeal the award of attorney's fees as excessive. Vosburg cross appealed the district court's refusal to enjoin double celling in the penitentiary.

proof of a reign of violence and terror in the particular institution. It is enough that violence and sexual assaults occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

There is no challenge to this instruction. It clearly reflects the applicable law. *See Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984); *Wade v. Haynes*, 663 F.2d 778 (8th Cir.1981), *aff'd*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Solem and Risk argue that Vosburg failed to prove that the risk of violence and sexual assault was substantial enough to put them on notice of the danger Vosburg faced. The defendants also maintain that prison policies, such as orientation for new inmates, availability of protective custody, and training of prison personnel, were adequate to address the existing level of violence at the penitentiary. We are satisfied, however, that sufficient evidence supports the jury's finding of liability.

The evidence contains specific and detailed accounts of the four separate instances in which Vosburg was sexually assaulted. Other young inmates also gave evidence that they had been raped repeatedly at the penitentiary, both in the intake area and other locations throughout the facility. Both sides presented statistical evidence as to the level of violence and sexual assault in the penitentiary. Vosburg also presented evidence that revealed that prison officials failed to refer assaults to the local prosecutors. The prison official in charge of investigating crimes at the South Dakota State Penitentiary testified that of approximately 500 crimes investigated by him between 1984 and 1985, only two or three were referred to prosecution. Conversely, the defendant's own expert witness, Warden Winston Satran of the North Dakota State Penitentiary, testified that *all* crimes committed in the North Dakota institution are referred to the local prosecutor. Furthermore, disciplinary reports revealed that there were over 140 instances of fighting and assaults from 1981 to 1985 in the South Dakota institution. None were referred to the local prosecutor. No sexual assaults at the South Dakota Penitentiary, including an instance in which an inmate had a broomstick shoved into his rectum, have ever been prosecuted. No inmate who has ever been accused of committing a rape in the South Dakota State Penitentiary, including Vosburg's assailants, has ever been disciplined.

Vosburg also presented extensive testimony as to the prison authorities' failure to respond to the risk of sexual assault; testimony that revealed that the prison authorities did not screen violent offenders from the less violent and non-violent when making cell assignments. Inmates were not segregated based upon the nature of the crime for which they were convicted, and no policy existed to segregate inmates who were the likely targets of sexual assaults. Warden Satran testified that at the North Dakota State Penitentiary newly-admitted inmates are screened and those convicted of violent crimes are segregated from the other inmates until prison authorities have an opportunity to assess their behavior. Warden Satran stated that if he had known what Warden Solem knew concerning the crimes with which Vosburg and Abbenhaus had been convicted, those two inmates would not have been double celled in his institution.

Both sides presented expert opinion testimony about the adequacy of the prison policies in place to protect the inmates from violence and sexual assault. Evidence adduced at trial revealed that prison authorities permitted the use of a pass system that allowed prisoners to have young inmates, like Vosburg, brought to an isolated area within the prison where no guards were stationed. Vosburg also presented evidence which illustrated that guards were stationed in a location removed from the inmates, where they could not see into the individual inmates' cells. Evidence revealed that one guard attempted to monitor

175 cells on four separate tiers during the night. Many of these cells housed two prisoners and monitoring rounds were conducted only every three or four hours.

The frequency of assaults at the penitentiary was sufficiently high that a jury might reasonably find pervasive risk of harm to the prisoners. The prison officials' failure to develop administrative policies to protect Vosburg and others in the intake facility and other high-risk areas of the penitentiary clearly supports a jury finding that the defendants failed to reasonably respond to the risk of inmate assault. Accordingly, we affirm the district court's denial of the defendants' motion for a judgment n.o.v. and a new trial.

**Instructions**

▉ The prison officials urge in the alternative that the district court erred in denying their motion for a new trial on the ground that there was an erroneous jury instruction on damages. Although the defendants did not object to the instructions as required under Fed.R.Civ.P. 51, they maintain that we should consider the damage instructions as plain error and hold that the failure to object should not bar them from raising the issue on appeal. Defendants argue that the instruction challenged has now been held to be erroneous by the Supreme Court of the United States and that such holding occurred after the trial in the present case. Assuming, without deciding, that this would present an exception under Rule 51 to recognize plain error,[3] we find that the error committed was harmless and not prejudicial under the circumstances of this case.

▉ In *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the Supreme Court held that a jury instruction authorizing an award of compensatory damages based upon the fact-finding assessment of the value or importance of a substantive

constitutional right constituted an erroneous charge. We find little variance between the instruction given here and the charge rendered in *Stachura.* We therefore hold that the instruction given by the trial court was in fact erroneous.[4] *See id.* at 312–13, 106 S.Ct. at 2546.

We note in the present case that the trial court instructed the jury that if there was a constitutional violation then the jury should award damages based upon: "(1) The physical harm suffered, including physical pain and discomfort; (2) The emotional and mental harm suffered, including fear, humiliation and mental anguish; (3) The extent and duration of his injuries;" as well as "discretionary" damages for violation of Vosburg's constitutional right to be free from cruel and unusual punishment. In *Stachura,* the Court found that the damages awarded were "probably significant" as they related to the value given for the violation of the constitutional right. The *Stachura* Court indicated that the award was not derived from any monetary loss and that a major point of the damages was to "compensate" plaintiff for the abstract value of his due process and first amendment right. *Id.*

We are confronted with a much different record. In the present case the record demonstrates that plaintiff was sexually assaulted on four different occasions. On each of these occasions the record illustrates both the substantial emotional and physical harm the plaintiff suffered. Vosburg was a youth of nineteen years. At trial, an expert testified that rape is the most devastating nonlethal offense that a person can endure. Young Vosburg most certainly will live with, and may suffer from these acts of human degradation for

---

**3.** *See Ratliff v. Wellington Exempted Village School Bd. of Educ.,* 820 F.2d 792, 798 (6th Cir.1987); *but see Carter v. District of Columbia,* 795 F.2d 116, 135 n. 12 (D.C.Cir.1986) (plaintiffs' constitutional damage award impenetrable under Rule 51 because defendant failed to object to the instruction at the time it was given).

**4.** No discussion is necessary to recognize that an intervening decision between the time of trial and appeal provides controlling law on appeal. *See Flanigan v. Burlington N. Inc.,* 632 F.2d 880 (8th Cir.1980).

the rest of his life. The details of some of these assaults provide the specifics of Vos- burg's vicious and sickening experience.[5]

Our research also reveals that in sexual

5. Vosburg was asked by his counsel:

Q What happened in June of '83 when you were there with Mr. Miller and Mr. Brooks?
A They took me to the broom closet and—
Q In the broom closet or dark room?
A The dark room, excuse me. And they—we waited there until the people in the dark room left, which would be approximately a minute.
Q Did you see any guards up there at that time?
A No, I did not.
Q Did you see Mr. Wait around after you gave him your pass?
A No, I did not.
Q Then what happened?
A After everybody else besides me, Mr. Miller and Mr. Brooks, everybody else left, then Mr. Miller said that he was going to go out and stand jiggers. Mr. Brooks told me to get—take off my pants and then get into a dog position.
Q Then what happened?
A He put lotion on my rectum, shoved his penis in and started slapping me.
Q How long did that last?
A Approximately forty-five minutes.
Q Was that painful?
A Yes, it was.
Q Did you have any bleeding from that?
A Yes, I did.
Q Where?
A From the rectum.
Q Did you report that to anybody?
A No, I did not.
Q Why didn't you report that to the doctor?
A Because he would have asked how I came about this. I would have had to tell him and I would have been classified a snitch. That, and it was an embarrassing situation.
Q Then what happened after that?
A I had started to put on my pants when Mr. Miller comes into the dark room.
Q And what happened then?
A He told me that I was either going to give him a blow job or have sex with him. I was in so much pain at the time that I didn't want no more, so I went ahead and gave him a blow job.
Transcript at 135–37.
A He told me that he wanted to show me something. So he leads me out into the hall, he walks down the hall a little ways with me and he opens this room with a six-inch piece of metal bar and he told—he tells me, "It's in there." I don't see anything in there and I ask him, "What?" And he says, "You don't have any money, right?" And I goes, "Yeah. I haven't got a job yet." And he goes, "Well, I don't want no money, I want sex." I told him, "I'm not that way." While I hesitated, he pushed me in.
Q Then what happened?
A He closed the door and he took out the—his penis and he told me to take off my pants.

So I did. Then he put hand cream on my rectum and he put his penis up my rectum.
Q How long did that last?
A About ten to fifteen minutes.
Q Did you consent to that?
A No, I did not.
Q Why didn't you scream or fight or do something?
A If I would have screamed or fought or anything, I would have been hurt worse than what I was.
Q Did Mr. Miller have a weapon at that time?
A Yes, he did. He had that piece of bar.
Transcript at 118–19.
Q And what happened?
A He told me to take off my pants. He still had the knife with him and the same logic held, that I didn't want to get stabbed, so I took off my pants.
Q Then what happened?
A He put lotion on my rectum and proceeded to rape me.
Q How long did that last, Willard?
A Between ten and fifteen minutes.
Q Did he ejaculate into you?
A Yes, he did.
Q Then what happened?
A I proceeded into the bathroom to clean up a little bit and Mr. Preston followed me. He told me, after I once was in there, that either I was going to have sex with him or Miller was going to beat me up.
Q And what happened then?
A I followed him back into the broom closet. On—at the door of the broom closet, Mr. Miller told me to have sex with Mr. Preston. After we were once inside the broom closet, Mr. Miller stayed outside to shoot jiggers. Mr. Preston told me I had a choice, either I could give him a blow job or I could have sex with him. I didn't want it in my mouth, so, the only other alternative I had was to take off my pants, which I did.
Q Then what happened?
A He put lotion on my rectum and proceeded to put his penis up my rectum.
Q How long did that last, Willard?
A Approximately fifteen minutes.
Q Then what happened?
A I got dressed. The door was open. I went back into the print shop area, picked up my pass and went back to West Hall.
Q Did you report any of that?
A No, I did not.
Q Did you consent to have sex with Mr. Miller or Mr. Preston?
A No, I did not.
Q Why did you do it?
A If I wouldn't have, I probably would have been dead now.
Transcript at 124–25.
Q Tell us what—how you've changed since you were raped?

assault cases, damage awards throughout the country can easily reach the six-figure level.[6] In the present case the award was at a minimal level almost approaching inadequacy. There is no cross appeal here on the inadequacy of the award and we therefore do not address that issue. However, it is clear that the paltry sum awarded the plaintiff is barely reasonable for the damages he incurred. Any award by the jury for the mere abstract violation of the eighth amendment was indeed minimal. We are confident that another jury, on retrial of the case on damages only, could easily return an award substantially greater than that which was returned. On this basis, although there was error, we find the error harmless.

**Injunctive Relief**

 Vosburg sought injunctive relief as it pertained to double celling. Based upon the testimony in the case both from the plaintiff and other youthful inmates illustrating the considerable frequency of assaults, the district court granted Vosburg's request for injunctive relief in part ordering the defendants to report to the Attorney General and to the State's Attorney for Minnehaha County all cases in which they had reasonable cause to believe that a rape had occurred at the prison. The district court, however, denied injunctive relief against double celling because subsequent to the jury trial the South Dakota penitentiary adopted written rules (1) prohibiting double celling of inmates in the orientation and indoctrination unit except when it was considered necessary for suicide prevention, and (2) prohibiting inmates convicted of crimes against other persons being double celled with inmates convicted of nonviolent crimes. The court also noted that the issue of double celling in the protective area of the prison had earlier been addressed by Chief Judge Porter in *Cody v. Hillard,* 599 F.Supp. 1025 (D.S.D.1984).

In *Cody,* Judge Porter enjoined double celling in the protective custody area. On this basis Judge Jones asserted injunctive relief beyond that rendered in *Cody* would not be necessary. On October 6, 1987, the panel opinion in *Cody v. Hillard,* 799 F.2d 447 (8th Cir.1986), which affirmed the district court, was reversed by this court en banc. *Cody v. Hillard,* 830 F.2d 912 (8th Cir.1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988). The effect of the en banc decision was to reverse the district court's award of injunctive relief with respect to double celling. The en banc court noted that although there was evidence of fighting and assaults between inmates, 599 F.Supp. at 1033, nothing in the record showed the comparative number of incidents of violence before and after double celling. This court held because the district court did not make a

A I can't sleep at night because, when I do get to sleep, I wake up with bad dreams. I fear for my life. I fear other people.
Q What kind of dreams do you have?
A One that I've had is I'm in this building getting chased by a green monster that I cannot outrun.
Q Did you ever have that dream before?
A No, I have not.
Q Did you ever have any problems sleeping before?
A No, I did not.
Q Do you still have those dreams?
A Yes, I do.
Q Since you filed your lawsuit have any inmates made advances on you?
A Yes, they have.
Q What kind of advances?
A I've been asked to moon inmates. I've been asked to participate sexually with inmates. I've—that's basically it.
Q Have you done that?
A No, I have not.

Q Have you received any counseling up there at the penitentiary to help you with any of these problems?
A No, I have not. I put in requests to a psychologist, thirty or forty of them at least, and he has seen me once.
Q Did you consent to any of those sexual contacts with those other inmates?
A No, I did not.
Transcript at 145–46.

6. *See, e.g., Jardel Co. v. Hughes,* 523 A.2d 518 (Del.1987) ($530,000 jury award to rape victim sustained on appeal); *Gordon v. Chicago Transit Auth.,* 470 N.E.2d 1163, 83 Ill.Dec. 743, 128 Ill.App.3d 493 (Ill.App.Ct.1984) ($200,000 jury award to assault and rape victim sustained on appeal); *Virginia D. v. Madesco Inv. Corp.,* 648 S.W.2d 881 (Mo.1983) (en banc) (trial court entered judgment for defendant notwithstanding the verdict; on appeal, Supreme Court of Missouri reversed and reinstated $100,000 jury award to assault and molestation victim).

finding of fact on this issue, there was no evidentiary basis for a finding that the elimination of double celling would alleviate the problems within the prison. *Cody,* 830 F.2d at 914.

In the present case, the record is replete with evidence of sexual assaults both on the plaintiff and upon other younger inmates. In the summer of 1981, an eighteen- or nineteen-year-old boy was raped three times by his cell mate. He tried to commit suicide after the rapes. The record in this case also reveals that more than 500 crimes were investigated in the South Dakota prison between 1984 and 1985 and that there were over 140 instances of fighting and assaults during that period of time. It is now 1988. Although South Dakota has made substantial changes in the prison system, as evidenced by a later report filed in the *Cody* case by the prison authorities, we have no way of knowing whether these additional changes have effectively provided a means to prevent the serious assaults revealed by the record before us. However, this issue cannot be decided here. Although the state has not made a suggestion of mootness, the briefs suggest that Vosburg was released in October of 1986. We assume this to be true although the record is otherwise silent as to this fact. On this basis the issue of injunctive relief appears to be moot. *See Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). The case would not fall within the narrow exception as providing challenged action of short duration and capable of repetition because there would be no reasonable expectation that Vosburg would be subjected to the same action again. *Id.* We therefore dismiss the appeal on the denial of the injunctive relief as moot.

## Attorney's Fees

The trial court awarded attorney's fees in this case under 42 U.S.C. § 1988. The trial court is in a much better position than this court to view the evidence and to evaluate the testimony and the work product of the attorney. We feel the award made by the trial court is a reasonable one and should be sustained. In doing so we offer our commendation to Michael J. Schaffer, plaintiff's attorney, for the obvious public service that has been performed in the detailed production of evidence that fills nine volumes of trial testimony.

## Post–Judgment Interest

■ The trial court failed to award post-judgment interest on the plaintiff's verdict. Title 28 U.S.C. § 1961 provides that "interest shall be allowed on any money judgment in a civil case recovered in a district court." It is well-settled that the court may award interest from the date of the verdict where an appropriate time has elapsed between the reading of the verdict and entry of the judgment. *See Buck v. Burton,* 768 F.2d 285, 286–87 (8th Cir. 1985). The delay between the verdict and the judgment was not the plaintiff's fault. We find that the trial court should enter judgment on the verdict and award post-judgment interest from the date of the verdict. The judgment on the verdict and the award of attorney's fees are hereby affirmed. The cause is remanded to the district court with directions to dismiss the prayer for injunctive relief as moot.

MAGILL, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's conclusion that the district court properly denied appellants' motion for a judgment n.o.v. and a new trial. The frequency of assault at the South Dakota State Penitentiary was sufficiently high that a jury might reasonably find a pervasive risk of harm to the prisoners. Appellants' failure to develop administrative policies to protect Vosburg and his fellow inmates in the intake facility and other high-risk areas of the penitentiary clearly justifies a jury finding that appellants failed to respond reasonably to the risk of inmate assault. Regretfully, however, I do not join the rest of the majority's opinion because I cannot agree that the misinstruction of the jury as to damages was harmless error.

I will begin by restating enough from the record to make my objections intelligible. At the end of a lengthy closing argument, Vosburg's counsel turned to the issue of damages and stated:

And then the final question you have got to decide, if you decide liability, you have got to decide the question of damages. I was appointed to represent Willard. As a part of my duty, I had a duty to put a number on what that is worth, to be raped, to have suffered that. I thought it was worth $500,000. I wouldn't go through it for that. I wouldn't go through it for anything. You're going to get an Instruction. It is Instruction No. 19 that talks about the value of a constitutional right. Take a look at that Instruction. It is an important right in our system. And maybe you can't—it's not like I have got medical bills or anything like that to show you what can be done or how to compute it. But, it is an important right and it is a right that is entitled to be compensated.

Tr. at 975.

After counsel's peroration, the district court, without objection, gave Instruction No. 19:

 \* \* \* \* \* \*

Damages for violations of constitutional rights are more difficult to measure than damages for physical injury or injury to one's property. There are no substantial medical bills or other expenses by which you can judge how much compensation is appropriate. In one sense, no monetary value we place upon Constitutional rights can measure their importance in our society or compensate a citizen adequately for their deprivation. However, just because these rights are not capable of precise evaluation does not mean that an appropriate monetary amount should not be awarded, that is, in the event you find there is liability.

The precise value placed upon any Constitutional right which you find was denied to the plaintiff is within your discretion.

This instruction was fully in accordance with circuit precedent, which approved of damage awards based on the abstract value, or importance, of a constitutional right. *Herrera v. Valentine,* 653 F.2d 1220, 1227–31 (8th Cir.1981). While this appeal was pending, the *Herrera* instruction was invalidated by *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2541 n. 5, 91 L.Ed.2d 249 (1986). As a consequence, the district court's instruction that the jury could properly consider the abstract value of the constitutional protection against cruel and unusual punishment is erroneous under the current state of the law.

The majority assumes [1] that *Stachura* must be applied retroactively, *ante* at 767, but then goes on to determine that the jury instruction was harmless error solely on the basis of its selective forays into the record. It is with the majority's use of the record and application of the harmless error rule that I take issue.

In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), and more recently in *Stachura,* 106 S.Ct. at 2542, the Supreme Court instructed us to look first to common-law tort rules of recovery in order to compensate for injuries caused by constitutional deprivations. We have previously identified several interests protected by common-law tort rules that might be relevant to constitutional deprivations. Persons deprived of their constitutional rights are entitled to compensation for (1) physical injury, pain and suffering; (2)

---

**1.** While failure to object to a jury instruction is normally fatal, *see* Fed.R.Civ.P. 51, we retain the discretion to review error not preserved for appeal if that error is so prejudicial as to have "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Rowe International, Inc., v. J.B. Enterprises, Inc.,* 647 F.2d 830, 835 (8th Cir.1981) (citation omitted). In *Ratliff v. Wellington Exempted Village Schools Board of Education,* 820 F.2d 792, 796–98 (6th Cir.1987), a case very near to the one before us, the court applied *Stachura* retroactively to nullify a damage award in a section

1983 action because the jury was instructed, without objection, to consider the intrinsic value of the plaintiff's constitutional rights. The *Ratliff* court's discussion of the interplay between the plain error rule, Fed.R.Civ.P. 51, and the Supreme Court's "retroactive application" doctrine, *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), illuminates the reasons for retroactive application of the *Stachura* rule where no objection to a jury instruction has been made at trial.

emotional distress; and (3) impairment of future earning capacity. *Taken Alive v. Litzau*, 551 F.2d 196, 199 (8th Cir.1977); *Bauer v. Norris*, 713 F.2d 408, 413 (8th Cir.1983). The latter category requires no elaboration because Vosburg made no claim for impairment of earning capacity. The sufficiency of proof as to the former two, however, merits some discussion.

A more searching view of the record reveals that Vosburg presented scant evidence as to the extent of his physical harm and emotional distress and no evidence of any physical illness resulting from that emotional distress. As Jury Instruction No. 19 indicated, "[t]here are no substantial medical bills or other expenses by which [we] can judge how much compensation is appropriate." The testimony set out in the majority's opinion, *ante* at 768–69, is carefully culled from nine volumes of trial testimony and represents the total evidence of physical and emotional harm that Vosburg attested to at trial. Vosburg also testified that he had not been examined by a medical doctor or mental health care professional, and that he was uncertain if the assaults had any effect on him because he hadn't seen a psychiatrist. Vosburg's expert, Dr. Sable, who testified about "rape trauma syndrome," was a medical doctor—not a mental health care professional—and never examined Vosburg. No other expert testimony was presented by Vosburg. While there was evidence about the effect of rape generally, there was little evidence of the emotional effect on Vosburg. As the Supreme Court cautioned in *Carey*, 435 U.S. at 263–64, 98 S.Ct. at 1052, emotional distress in a section 1983 action must be proved by "showing the nature and circumstances of the wrong and its effect on the plaintiff." The Court further noted: "Although essentially subjective, genuine injury in this respect must be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury." *Id.* at n. 20 (citation omitted). Vosburg simply presented no concrete evidence of his emotional distress.

I would be happy to forgive this sin of omission and join the majority's affirmance of the damages award if the district court had not instructed the jury to assign a value to Vosburg's constitutional right to be free from cruel and unusual punishment. This instruction, and the prominent part that it played in Vosburg's presentation of proof, as indicated in the trial transcript and in his closing statement, presents the real danger that the jurors' consideration may have wandered from the injuries Vosburg suffered into an impermissible consideration of the value of his constitutional rights, or at the very least, that the jury may have blurred the distinction between the two. Both results are prohibited under *Stachura*, 106 S.Ct. at 2546.

This danger is exacerbated by the nature of the constitutional right at issue. The Eighth Amendment protection against cruel and unusual punishment is a right esoteric to most who serve as jurors, unlike other rights more conspicuous in our system of ordered liberty. Jury Instruction No. 19 directed the jury to assign an abstract value to the right to be free from "cruel and unusual" punishment, punishment defined by the district court in Jury Instruction No. 11 as "abuse of such base, inhumane, and barbaric proportions as to shock the sensibilities." Thus, the jury was asked to give an abstract value to a right that in itself was defined in abstract terms. These jury instructions, taken together, increased the likelihood that the jury returned an award based on abstract, as opposed to actual, damages.

The majority attempts to vault over this conundrum by comparing the damages award here to damages awarded in other sexual assault cases. In each of the cases cited by the majority, however, substantial evidence of physical and emotional harm to the victim was presented to the jury. None of those cases involved a challenge to the jury instructions or damages awarded, but instead raised issues of liability. More to the point, comparison of jury awards cannot alter the fact that the jury verdict here was a general one and thus is not amenable to the type of "harmless error" calibration

that the majority puts to it. *Stachura*, 106 S.Ct. at 2546.

The essence of my complaint is that the majority focuses on the likelihood that a remand would result in a larger award for Vosburg, instead of considering, as it must, whether the verdict here may have been based on an impermissible consideration of the value of Vosburg's constitutional rights. In so doing, the majority turns a blind eye toward the last paragraph of *Stachura*, which controls here:

> When damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, "[the] error in the charge is difficult, if not impossible, to correct without retrial, in light of the jury's general verdict." * * * It is likely, although not certain, that a major part of these damages was intended to "compensate" respondent for the abstract "value" of his [constitutional] rights. For these reasons, the case must be remanded for a new trial on compensatory damages.

*Id.* at 2546 (citation omitted).

In the final analysis, how much, if anything, the jurors awarded for the intrinsic value of Vosburg's Eighth Amendment rights is destined to remain unknown and unknowable, given the cloistered nature of jury deliberations. Without this insight, the jury instruction at issue "constitutes an error 'so obvious and prejudicial as to affect the fairness' of the trial." *Ratliff*, 820 F.2d at 798 (citation omitted). Although I can well understand the majority's sympathy for Vosburg because I share in it, I see no escape from the conclusion dictated by *Stachura* and *Ratliff*, that we must remand for a new trial as to damages.

### ON REHEARING

The petition for rehearing en banc is denied. The plaintiffs' attorney is awarded attorney fees for time expended in this court in the amount of $6,768.75 plus six percent sales tax on said fee. Counsel is likewise awarded reimbursement for expenses in the sum of $1,235.66. Said sum includes the expense of $325.00 for paralegal services.